# CHARLESTON.

FEARON LUMBER & VENEER COMPANY *v.* WILSON *et al.*

Submitted January 15, 1902.     Decided March 8, 1902.

1. SALE OF REAL ESTATE—*Mistake—Vendor—Vendee.*

When a deed is made in pursuance of a contract of sale of real estate, entered into under a misapprehension, or in ignorance, of the location of the vendor's land and conveys to the purchaser a tract of land, wholly different in location and character from the land contracted for, a court of equity will, at the suit of the vendee, rescind the contract of sale and put the parties in *statu quo,* although there was no fraudulent intent on the part of the grantor. In such case rescission results from the mutual mistake under which the parties entered into the contract. (p. 31).

Appeal from Circuit Court, Wayne County.

Bill by the Fearon Lumber Company against W. P. Wilson *et al.*

Decree for defendants and plaintiff appeals.

*Reversed.*

CAMPBELL, HOLT & CAMPBELL, for appellant.

W. W. MARCUM, J. H. MEEK and P. H. NAPIER, for appellees.

POFFENBARGER, JUDGE:

This is an appeal from a decree pronounced and entered by the circuit court of Wayne County, December 11, 1900, in a suit in chancery wherein the Fearon Lumber and Veneer Company, an Ohio corporation, is plaintiff and W. P. Wilson, Otis Wilson and Fannie Wilson are defendants. The object of the suit was to rescind an executed contract of sale of real estate and compel repayment to the vendee of the purchase-money amounting to one thousand one hundred and seventy dollars with interest thereon from the time it was paid, one dollar and twenty-five cents recording fee paid by the plaintiff and one hundred and fifty-four dollars and thirty-five cents for expenses incurred by the plaintiff in consequence of said sale.

Depositions were taken by plaintiff and defendants and, on the hearing of the case, the court dismissed the bill.

A thorough examination of the record leads to the conclusion that the conveyance was made and the purchase-money paid under a mistake of the parties as to the identity of the land, by reason of which the plaintiff did not obtain the land its agents had good reason to believe it was buying. They went upon and examined one tract of land, believing it to be the property of the defendants with whom it was negotiating and the land said defendants were offering to sell, but after the deed was made and the contract of purchase fully executed, it was found that no part of the land so examined and believed to be the land described and conveyed in the deed was within the boundaries designated in the deed. The plaintiff was engaged in the business of manufacturing and selling lumber and veneering, having its principal office and plant located at the city of Ironton, Ohio, and the inducement to the contract was the belief that the land of the defendants had valuable timber on it suitable for manufacturing purposes. The land examined by its agents was land of that character, but the land actually conveyed had no timber of any consequence on it and was wholly worthless to the plaintiff in that respect. H. M. Runyon, an agent of the company, having been informed that the defendant, W. P. Wilson, was the owner of a tract of timber land, went over what was supposed to be the land with one Edward Meeks, who had some knowledge of the location of the Wilson land. Being satisfied with the land shown him by Meeks, he then sought Wilson and contracted with him for and on behalf of the plaintiff to purchase the land at the price of six dollars per acre, making the total contract price one thousand one hundred and seventy dollars, the tract being represented to contain one hundred and ninety-five acres. This contract being reported immediately to the company a check for the sum of one hundred dollars was sent to Wilson on the next day, September 13, 1899. On the check was written a memorandum that said sum was payment on one hundred and ninety-five acres of timber land on the head of Moses creek bought at six dollars per acre, "the same showed to H. M. Runyon, September 12, 1899." The agreement was that the residue of the purchase-money should be paid when the land should be surveyed and the deed made, and it was agreed that in a short time thereafter the parties

would go upon the land and have the same surveyed by J. H.
Marcum.   At the time appointed for the making of the survey,
Runyon, R. N. Fearon, president and general manager of the
company, one Arch Colbert, W. P. Wilson and Edward Meeks
met at a place called Wells Branch on the Norfolk and Western
Railway, with the intention to go from that point to the land to
have it surveyed, but Meeks reported that the surveyor, J. H.
Marcum, had been called away on account of sickness and could
not make the survey on that day.   The plaintiff's agent being
desirous of closing the contract as soon as possible, they pro-
posed that all should proceed to the land without a surveyor and
locate it as nearly as possible by lines and monuments, believing
that that could be done nearly enough for their purposes, but no
conveyance could be had and in order to proceed it was neces-
sary to walk some distance.   Wilson declined to go and asked
to be excused as he was unaccustomed to walking and did not
feel that he could stand the trip.   As to what occurred between
the parties just at this point there is much controversy.   Fearon,
Runyon and Colbert all swear that Wilson and Edward Meeks
assured them that Meeks was well acquainted with the land and
could practically locate its lines and corners and that Wilson
sent Meeks with the other parties for the purpose of so locating
it.   On the other hand, Wilson denies that he made any such
representation and also that he requested Meeks to go with
them.   Ed. Meeks and J. H. Meeks, his son, who happened to
be present, say that no such representation was made by either
Wilson or Meeks and that Meeks went with Fearon, Runyon and
Colbert at the request of said parties.   Meeks says he told these
parties that he knew nothing about the land except what J. H.
Marcum had told him concerning the lines and corners and lo-
cation of the land.   The result of the deliberation was that
Wilson went no farther but returned to the town of Wayne, the
county seat, and Meeks went on with Fearon, Runyon and Col-
bert and conducted them over a well timbered tract of land
pointing out in a general way the timber and general location
of the land and in some instances practically the location of
lines and corners.   It was the same tract of land that Meeks had
formerly shown to Runyon and lay approximately a mile and a
half from the residence of Mr. Meeks.   Runyon swears that
Mr. Meeks told him on the occasion of his pointing out the land
the first time that he was employed by Wilson to show the land

to any one who wanted to buy it and that he knew the boundary and had helped J. H. Marcum to run the lines. Fearon swears that on the second occasion Wilson told him that Meeks knew the lines and could show the land better than he could and that he thinks Meeks claimed that he had been present when the lines were run and could show the timber correctly and that he then told Wilson that if he did not desire to go Meeks would answer to represent him. Colbert says that in the conversation at Wells branch Meeks or some of them stated that he knew the lines about as well as Wilson and had been around it with Marcum and surveyed the greater part of the way around the tract and proposed that he go and show the land. Meeks admits that he told Runyon Wilson had told him to show the land to intending purchasers and that Wilson, after the sale was made, paid him, in an indirect way, fifteen dollars for his services, but he denies that he told Fearon or Runyon that he knew certainly where the land was and that he had ever seen any of the lines run, but only undertook to show them where Marcum had told him the land laid. After having thus looked at the land, Fearon went back to the town of Wayne and expressed himself as being satisfied with the land and a deed was executed to the company by the defendants Otis Wilson and Fannie Wilson. W. P. Wilson had purchased the land some years before as delinquent for the non-payment of taxes and had had the deed made to his son Otis Wilson but claimed to be the real owner of the land himself and procured them to make the deed to the plaintiff. Upon his return to Ironton Fearon sent a check of the company for the balance of the purchase-money.

Soon after the purchase was completed rumors were afloat to the effect that the land conveyed to the plaintiff was not the land it had contracted for but was another tract of land upon which there was no timber. Hearing this Fearon telegraphed Wilson to hold the check and notified the bank not to pay it and sent Runyon to see Wilson. Runyon claims that Wilson assured him that there was no foundation for the rumors and that he would guarantee the land to be all right and he thereupon telegraphed Fearon to that effect and the check was paid, but Wilson denies that he made such statement to Runyon and says, in substance, that Runyon rather apoligized for coming to him about the rumors and said he knew the land was all right and

would guarantee the payment of the check. The plaintiff then procured teams and sent them up to the neighborhood of the land for the purpose of cutting the timber and it was again rumored that the timbered land upon which work was about to be commenced was not the land conveyed to the company and work was postponed until a survey was made by one L. F. Ball which resulted in showing that none of the land that had been shown to the agents of the company was included in the deed. Thereupon the plaintiff offered to re-convey the land and demanded that Wilson repay it the purchase-money but he declined to accept such conveyance and refused to repay the money. Wilson says he did not know the location of the land or its character and made no representation in reference to those matters and denies that Meeks was his agent or was authorized to make any representation in respect to the land. Both he and Meeks deny that there was any fraudulent intent on their part in any thing that was done by them in effecting the sale.

From this state of facts it is manifest that the court erred in dismissing the plaintiff's bill and refusing it any relief. If it be conceded that Meeks did not act as the agent of Wilson in the sale of the land, the case still falls within the well settled principle that where by reason of a mutual mistake as to a matter of fact the vendee failed to get by his deed substantially what he contracted for he is entitled to a rescission of the contract although the contract was executed. "Where, in an agreement, a mutual mistake is made, by both parties, in a matter which is the cause and subject of the contract, that is, in the substance of the thing contracted for, no fraud being imputable to either party; such mistake is good ground in equity for rescinding the agreement, even after it has been fully executed." *Glassell* v. *Thomas,* 3 Leigh 113. The case out of which this proposition was evolved was one in which both contracting parties resided in Virginia. One of them owned a tract of about four hundred acres of land in the county in which he resided. The other owned two thousand acres situated in Kentucky. Having entered into negotiations for the sale and purchase of their land, respectively, by and to each other, Glassell, the owner of the Kentucky land, in the year 1814, sent his son to Kentucky to ascertain the location of the land and was, by mistake, shown certain lands belonging to another party, a plat of which he brought home and delivered to his father. Thereupon the two parties

entered into a written contract by which Towles agreed to sell
Glassell his land, about four hundred acres, at fifteen dollars
and fifty cents per. acre and Glassell agreed to sell Towles 'his
two thousand acres in Kentucky at such ,a price as might be
fixed by values, one of whom, Paul Leather, living near the land,
was to select the other two.   But this was modified by a sub-
sequent agreement, giving Towles the right to decline to take
the Kentucky land and, in that event, Glassell the right to pay
the value of the lands in money.   In 1816 Towles sent his son
to Kentucky to ascertain the location of the land and its char-
acter and one Ruby, the surveyor who pointed out the wrong
land to Glassell's son showed the same land to Towles' son and
made a plat and survey of one of the one thousand acre tracts
fixing the quantity at one thousand one hundred and fifty-five
acres and the valuers fixed the price at two dollars and twenty-
five cents per acre.   Upon the return of Towles' son with the
plat and valuation, Towles and Glassell executed conveyances
to each other for the land.   Towles sold the Kentucky land to
Robert Thomas and Thomas leased it to one Walker.   Walker
went to Kentucky in 1819 to take possession of the land and it
was found to be occupied by a son of George Lewis.   Further
investigation showed that it was not the land that Glassell
owned, but that he did own another tract of land containing two
thousand acres adjoining the tract described in the deed and
differing from the land contracted for very materially in value.
It was held that the contract must be wholly rescinded and that
Towles could not be compelled to take the land which Glassell
actually owned in lieu of that conveyed because it was not the
land actually contracted for.   In *Graham* v. *Hendren,* 5 Munf.
185, the bill was filed to compel the specific performnace of a
contract of sale of real estate and it appeared that lands which
Hendren offered to convey were not the lands which the defend-
ant contracted to purchase and was much less valuable and the.
court held that there was such a misunderstanding between the
parties at the time of entering into the written contract as to
the identity of the land to which that contract related, that a
court of equity ought not to interfere by decreeing specific per-
formance.   In *Chamberlaine* v. *Marsh's Adm'r.,* 6 Munf. 283,
the court held that the contract for a sale of land must be res-
cinded on the ground that both parties were mistaken as to the
situation and other circumstances materially affecting value of

the land.   This is not exactly in point but is another exampli-
fication of the same equitable principle.   In *Lamb* v. *Smith,* 6
Rand. 552, the vendor put the purchaser in possession of a cer-
tain lot believing it to be his own land and then executed a
deed conveying to him a different lot.   The vendee having dis-
covered the mistake filed a bill for a recission of the contract
and to compel repayment of the purchase-money and the court
held that he was entitled to the relief prayed for, Judge Green,
delivering the opinion of the court, saying:  "Here was a mu-
tual mistake as to the very subject of the contract, and it is
void, and should be rescinded, and the parties put in *stalu quo,*
by the repayment of the money, the vendor having no title to
the property really sold."   The principles announced in these
cases are also laid down in the case of *Tucker* v. *Cocke,* 2 Rand.
51, but that case was different in its nature, the question being
as to the number of acres in the tract of land sold, the court
holding that the difference in quantity was not sufficient to af-
fect the substance of the contract.   In *Thompson* v. *Jackson,* 3
Rand. 504, the rule is asserted that "an objection, to justify the
rescission of an executed contract must be such as affects the sub-
stance of the contract," and that in order to be excepted from
the general rule that the element of fraud is necessary to a res-
cission of the contract, the circumstances must bring the case un-
der the head of mistake and that the mistake must be plain
and palpable, affecting the very substance of the subject mat-
ter of the contract.

This principle is adhered to in other states.   In *Sweezy* v.
*Collins,* 36 Ia. 589, there was a misrepresentation as to quan-
tity, but it was not fraudulent, the vendor himself being mis-
taken as to the quantity of the land.   It was represented to con-
tain seventy-five acres but in fact contained only about sixty-
four and the court held that it was a case of mutual mistake and
the vendee was entitled to relief.   In *Montgomery* v. *Shockey,*
37 Ia. 107, relief was given upon the same principle, the land
conveyed being vastly different in character and location from
what it was represented to be.   From the evidence the court did
not feel warranted in saying that the misrepresentation was
fraudulently made and granted relief upon the ground of mu-
tual mistake.   The case of *Larsen* v. *Burke,* 39 Ia. 703, was
one in which the purchaser supposed he was obtaining certain
town lots, being nice lots, high, nearly level, overlooking the

city of Keokuk and of the value of five hundred dollars. But the lots conveyed were other and different lots, rough, uneven, broken and lying in a hollow. Relief was granted on the ground of a mutual mistake as to the identity of the lots. In *Barfield* v. *Price,* 40 Cal. 535, the court laid down this rule: "If the plaintiff supposes he is selling a different tract of land from that conveyed, and the defendants think they are purchasing the tract actually conveyed, there was a mutual mistake as to the subject matter of the contract, in which case there is in fact no contract of sale."

Such being the law it becomes practically unimportant and immaterial whether Meeks was or was not the agent of Wilson, although it is laid down in *McKinnon* v. *Vollmar,* 6 L. R. A. 120, and in *Law* v. *Grant,* 37 Wis. 548, that if the wrong land is pointed out to a purchaser by the vendor's agent, the purchaser is entitled to rescind his contract but is not entitled to do so if the person so pointing out the wrong land is not the agent of the vendor. It may well be doubted whether this position is in harmony with the Virginia cases cited. However, the evidence leaves no room for two opinions as to whether Meeks was the agent of Wilson. As already shown he testifies that Wilson had employed him to show the land to intending purchasers and that he so informed Runyon when the latter first came to see him about it and also that Wilson had in a way paid him fifteen dollars for his services. Wilson delivered up to Meeks' son a note for fifteen dollars in the presence of Meeks himself and Meeks says the consideration of that surrender was his services in so pointing out the land. Wilson denies that Meeks was his agent but does not deny the payment to which Meeks testifies. It is wholly unimportant whether Meeks knew his representation as to the location of the land was false. Ignorance in such case will not prevent the misrepresentation from affording ground for the rescission of the contract. The inquiry in such case is not whether the vendor or the agent representing him knew the representation to be false, but whether the purchaser believed it to be true, relied upon it and was mislead by it in entering into the contract. *Grim* v. *Byrd,* 32 Grat. 293; *Linhart* v. *Foreman's adm'r,* 77 Va. 540; *Lowe* v. *Trundle,* 78 Va. 65.

These principles make it clear that the decree of the circuit court is erroneous. It must be reversed and the cause re-

manded and a decree must be entered by the circuit court requiring Wilson to repay the purchase-money with interest, and accept the deed executed by the plaintiff re-conveying the land to him or his son as he may direct.

*Reversed.*