# Richmond.

## BRIGGS AND OTHERS V. WATKINS AND OTHERS.

### March 9, 1911.

### Absent, Keith, P.

1. LOGS AND LOGGING—*Laches—Rescission.*—The complainants in the case in judgment are not barred by laches from maintaining a suit to rescind their contract for the purchase of standing timber. They took reasonable precautions to ascertain what they were buying, and by the terms of their purchase they had sixteen years within which to cut and remove the timber. The mutual mistake giving them the right to rescind was discovered within two years after their purchase and before their last payment became due, and they did not neglect to do anything they ought to have done whereby the mistake would have been discovered sooner.

2. CONTRACTS—*Mutual Mistake—Rescission—Case in Judgment.*—If purchasers honestly believe that they are purchasing, and the vendors, with equal honesty, believe they are selling, the standing timber on about 1,800 acres of swamp land, and the purchasers by their deed get the timber on only about 1,400 acres— the timber on the remaining acreage being of little or no value, and the land itself occupied and claimed by other parties—the minds of the parties have never met, and the contract is founded on a mutual mistake of fact touching the very basis of it, and will be annulled by a court of equity at the instance of the purchasers, especially when the circumstances are such that the parties can be placed *in statu quo.* The mutual mistake being established, the result would not be different, although a third person who erroneously pointed out the boundaries to the purchasers at the suggestion of the vendors was not the agent of the latter.

3. RESCISSION—*Mutual Mistake.*—The mutual mistake for which a court of equity will rescind a contract may be common to both parties to a transaction, and may consist either in the expression of their agreement, or in some matter inducing or influencing the agreement, or in some matter to which the agreement is to be applied.

Appeal from a decree of the Court of Law and Chancery of the city of Norfolk. Decree for defendants. Complainants appeal.

*Reversed.*

The opinion states the case.

*Willcox, Cooke & Willcox,* for the appellants.

*Thomas W. Shelton,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The facts out of which this litigation arises are as follows: In March, 1907, E. A. Watkins & Bros., defendants below, dealers in and manufacturers of lumber in the city of Norfolk, Va., owned, by purchase made in February, 1906, all of the standing timber within a certain boundary composed of two adjoining tracts of land, lying in the Dismal Swamp section, Pasquotank county, N. C., known, respectively, as the Benj. Jones patent, containing 1,280 acres, and the Thomas Forehand patent, containing 535 acres; and during the month of March, 1907, negotiations were begun between George S. Briggs, a lumber dealer of Norfolk city, and Ludloe Watkins, one of the firm of E. A. Watkins & Bros., looking to a sale to the former of the said standing timber, which negotiations resulted in an option to Briggs and his associates in the transaction to purchase the timber at any time within thirty days from the date of the option (March 20, 1907), upon certain terms, etc., therein named. Immediately thereafter Briggs took up the matter with his associates and co-complainants in this suit, with a view to determining whether or not they would avail themselves of the option, and shortly thereafter M. L. Watkins, a competent estimator (in no way related to or connected with E. A. Watkins & Bros.),

was sent to examine the timber and make an estimate of the quantity thereof. Before M. L. Watkins went to North Carolina to examine the timber he was given at the office of Watkins & Bros., by Dempsey Watkins, a member of that firm, a plat as his guide, which plat purported to show the character of the timber and the outlines thereof, i. e., of both the Jones and the Forehand tracts, and had a footnote saying that the black lines thereon indicated "swamp," i. e., timbered and not cleared or arable land. Both Briggs and M. L. Watkins understood from this plat furnished by E. A. Watkins & Bros. and what was said by members of that firm, that the land upon which the timber stood which they proposed to sell to Briggs and his associates was all "swamp" land.

M. L. Watkins proceeded to North Carolina and secured the services of one Rountree, to whom he had been referred by Dempsey Watkins, as a man who could show him the timber that he was to estimate, and examined the timber on the Jones tract, but owing to the wet conditions prevailing there, only examined that on the Forehand tract from a point to which Rountree had carried him, the latter telling Watkins that the turnpike road separated the two tracts, and that the Forehand tract lay to the west. From what M. L. Watkins was then told by Rountree and what Dempsey Watkins had told him and he himself saw, he reached the conclusion that the Forehand tract was simply a swamp on the edge of the Jones tract, and that the whole was of the character of that shown him by Rountree; whereupon he reported to Briggs that both tracts were swamp land, estimating the pine timber standing on the Jones tract at twelve millions of feet, and the timber on the Forehand tract (all gum, cypress, oak and poplar) at six millions of feet, including the gum on the Jones tract.

Relying upon the representations of Watkins & Bros. that the two tracts were swamp land, as indicated on the

plat they furnished as a guide for M. L. Watkins in the examination of the timber on the land, and upon the report of M. L. Watkins as to the quantity of standing timber thereon, Briggs and his associates, on the 6th day of May, 1907, entered into a contract with E. A. Watkins & Bros. for the purchase of said standing timber, at the price of $24,000, one thousand dollars to be paid in cash (which was paid), nine thousand dollars to be paid in fifteen days, and two notes were given for seven thousand dollars each, payable, respectively, at one and two years from their date, secured by trust deed to Thomas W. Shelton upon the said standing timber.

The first note of $7,000 was paid when it became due, or soon thereafter, and in April, 1909, before the last note became due, Briggs and his associates being ready to begin the cutting and marketing of said timber, sent two civil engineers to survey the same, with the view of locating their logging roads. When these surveyors went upon the lands for the purpose of making a survey thereof, they were able to locate the land called for in the Jones patent, finding the same to be "swamp" land, with timber growing upon it; but when they attempted to locate the property known as the Forehand patent, it was found that there were not within the lines of this patent more than 230 acres which was not occupied and claimed by other parties; and of the 230 acres 110 acres were found to be timbered in small pine timber, practically worthless, and only 120 acres had any gum timber upon it.

Upon obtaining this information Briggs and his associates declined to pay the $7,000 note when it became due, and caused their engineers, together with M. L. Watkins, to go again upon said lands for the purpose of verifying the surveys and inspecting the same. On the 3rd of August, 1909, upon re-examination, the engineers found that their former survey was correct, while M. L. Watkins

3

found that instead of having examined, in the first instance, timber upon land within the lines of the Forehand patent he had examined the timber upon a very small strip along its southern line, and had examined principally the timber upon swamp land belonging to the Richmond Cedar Works and that he had been totally misinformed as to the Forehand patent by Rountree, the party to whom he had been referred by E. A. Watkins & Bros., so that M. L. Watkins, relying upon the plats which had been furnished him and upon information obtained from the man, Rountree, had examined timber which, in the greater part, was not embraced within the Forehand patent.

Thomas W. Shelton, the trustee in the aforementioned deed of trust, having notified Briggs and associates that he would expose the standing timber for sale under the deed, they on the 11th day of August, 1909, filed their bill in this cause and obtained an injunction restraining the trustee from proceeding with a sale of the timber until a further order of the court.

In their bill the complainants set up the facts above stated, and allege that there had been a mutual mistake in entering into the contract of purchase of the said timber, in that E. A. Watkins & Bros. had believed that they were selling, and actually sold, the timber upon one tract of land, while complainants had bought the timber upon an entirely different tract; that there was practically no timber upon the land actually embraced within the lines of the Forehand patent, while M. L. Watkins, upon information obtained from a citizen of that vicinity as to the location of the land, and as he was directed to do by E. A. Watkins & Bros., had represented to the complainants that there were at least six million feet of timber, gum, cypress, etc., including the gum on the Jones tract; that E. A. Watkins & Bros. had represented all along that the timber they were selling was growing on swamp land; that complainants

would never have purchased the timber upon said lands at the price of $24,000 if they had not been misled as to the character of the lands and the quantity of timber thereon; and offered to reconvey the said timber and to receive back the purchase money already paid, or to retain the timber which had been conveyed to them and to have the purchase price abated to such an amount as would be fair and equitable under all the facts of the case.

Upon the hearing of the cause on the bill of complaint, the answer of the defendants thereto and depositions taken and filed, the trial court entered the decree from which this appeal is taken, dismissing appellants' bill.

In the outset we must determine whether or not appellants have been guilty of such neglect or laches as disentitles them in a court of equity to the relief asked in their bill; and we are of opinion that the answer to that question should be in the negative.

In the first place, they took reasonable precaution to ascertain what they were buying, and by the terms of their purchase they had sixteen years within which to remove the timber; so that both parties necessarily understood that the manufacture and marketing of the timber was not to begin at once, but at some future time within the sixteen years when appellants, in the due course of their business, might deem it advisable to put the timber upon the market; and it appears that the alleged mistake of both parties to the contract was not, in fact, discovered until about the time that the last purchase money note was nearing maturity, and when appellants were preparing to market the timber. In the second place, there is no proof that appellants should have done anything which they neglected to do, and which would have disclosed sooner the alleged mutual mistake with respect to the timber actually conveyed to them.

There is some suggestion in the argument that appel-

lants made no claim that they had been misled in making their purchase of the timber in question until the price of such timber had gone down and they had been refused an extension of time within which their last purchase money note was to become payable, but the proof does not bear out such contention. It is true that the market price of such timber went down after the sale to appellants in 1907, but it also appears that the prices were better in 1909, when appellants were preparing to handle this timber and when they discovered the mutual mistake which led them into their purchase of which they are complaining. If they asked for an extension of time in which to pay their last note, it was no more than they had asked with respect to their first note, and which had been granted.

If appellants believed they were buying and appellees believed they were selling standing timber upon about 1,800 acres of swamp land, and the former, by the conveyance made to them by the latter, get, not the timber on swamp or timbered land, but timber on only about 1,390 acres of the 1,800 acres, the timber on the remaining acreage being of little or no value, and the land itself occupied and claimed by other parties, then, as would seem clear, the contract was founded on mutual mistake of the facts constituting the very basis or essence of it, and such a contract should be annulled, especially when the circumstances are such that the contracting parties can be put *in statu quo.*

It is neither alleged nor sought to be proved that appellees or either of them fraudulently misled appellants into the making of the contract, but it is alleged and proven that Dempsey Watkins, of the appellee firm, in confessed ignorance of what timber and the quantity there was within the lines of the Forehand patent, led appellants to believe that this was swamp and timber land, and knowing that M. L. Watkins was to make an examination of the timber

and estimate the same, gave Watkins a plat of both the Jones and the Forehand tracts, which plat upon its face purported to embrace within its black lines only swamp land, the much larger portion being within the black lines, and M. L. Watkins was directed to apply for information as to the location of the land to a citizen of that vicinity by the name of Rountree, which instructions Watkins followed, and was by Rountree shown timber which he said was within the Forehand patent, but which was, in fact, outside of it and belonged to the Richmond Cedar Works.

Briggs, who conducted the negotiations with appellees, before closing the option, took his associates and M. L. Watkins to the lands, and the latter showed them the Jones tract, and pointed out the timber that Rountree said was within the lines of the Forehand tract. When testifying as a witness in this cause, Briggs stated that Dempsey Watkins, who furnished the plat, told him that he had never been upon the Forehand tract, but gave him (Briggs) the plat showing the whole property, and directed him to a party by the name of Rountree, whom he could find down there, to show it to him; that when he and his associates made their purchase they understood that they had purchased the timber on the 1,280 acres of the Jones tract that was all timbered land, which he (Briggs) had personally seen, and further understood that the 535 acres of the Forehand tract was all swamp land and no cultivated land. On cross-examination Briggs was asked: "You stated just now, in answer to counsel, that you understood the Forehand patent was all timber; who represented that to you?" Ans. "Mr. M. L. Watkins; all swamp land; and also the Watkins Bros. told you (Mr. Shelton) that they understood it was all swamp land, and the maps themselves showed it was swamp land."

M. L. Watkins, in addition to stating in detail as to how he was misled in the estimate he made and reported to

appellants of the timber on the Forehand tract by Rountree, testified as follows: "I was directed to go down to that section and see a Mr. Rountree, who had been, as I understand and as I was informed, over the land, and had been the guide of those who had examined that land before I went there. I do not know how many times he had been in there, but he had cut some inroads or bushed out some paths which led into the timber at several places, and I went with him through those paths as best I could and as far as I could. The condition of the land was bad; it was a very wet season. I examined the best I could and the information I got from him was that upon which I based my estimate."

Ludloe Watkins, one of the appellees, and who in the beginning conducted the negotiations with appellant Briggs, after having denied knowing anything personally of the man Rountree, testified that he made no representations to Briggs as to Rountree being a representative of the appellee firm, but further said: "I know nothing about that part of it. I may have told him a man named Rountree went with my brother when he went to look at the Jones tract."

Dempsey Watkins makes this statement: "When the matter of this purchase was taken up, M. L. Watkins came to our office and took the matter up with me as to the location, and I am of the opinion, and I think I can almost positively say, that at that time he took this map spoken of and he wanted to know of me as to the best means of locating and looking at this timber. I told him when we looked at it we went to Elizabeth City on one evening, and the next morning we came out from Elizabeth City and went to a man's house by the name of Rountree, who had been mentioned to us by Mr. George L. Benton, one of the sellers, as one who could show us the timber. I found Mr. Rountree and he took us on it, and he said he knew where the Jones tract was. We went to the Jones tract. This I ex-

plained to Mr. M. L. Watkins when we were in conversation about it, and told him if he would find the same man Rountree I supposed he could show him the timber, and I supposed he would be reasonable in his charge. We paid him something, and we had nothing to do with this, and he was not employed by us, and consequently they would have to look after that part of it. I told him the means by which we reached it, and at the same time I told him we did not look at the five hundred and thirty-five acre piece, as we did not really suppose it amounted to anything. As far as I saw, it was simply a swamp on the edge of the Jones tract, and I did not know what was beyond. Rountree had not shown it, and I did not know whether he was capable of showing it, as far as that was concerned."

Without attempting to review the evidence in greater detail, it may be assumed that appellants believed they were buying the timber on two tracts of "swamp" land, and that appellees, with equal honesty of purpose, believed they were selling the timber on two tracts of "swamp" land, and not on one tract of "swamp" and the timber on another tract, the timber upon which covered only a small part of an area of 535 acres, and which had but little value, that on the remaining area having no value whatever, but the land being arable and in the occupation of and claimed by other parties. The plat delivered by one of the appellees to M. L. Watkins, the estimator, as we have seen, indicated on its face that the timber which the estimator was to view and estimate was on swamp lands, and not on cleared and arable lands. Further, appellees referred M. L. Watkins to the man Rountree, to be found in the vicinity of the timber to be estimated, for further information needed as to the location of the timber. It is true, doubtless, that appellees believed Rountree could and would furnish information as to the location of the Forehand tract of land,

and doubtless Rountree innocently showed the Forehand tract of land or furnished information as to its location which misled M. L. Watkins in the estimates he made and reported to the appellants of the quantity, etc., of the timber upon said tract of land, exceeding in quantity more than five millions of feet what the proof clearly shows was to be found on this tract of land.

It is by no means necessary that the man Rountree should have been acting as the agent of appellees when giving M. L. Watkins the information which misled the latter as to the location of the Forehand tract and the standing timber thereon, in order to entitle the appellants to a rescission of their contract with appellees. Here we have the case of the buyers believing that they were buying the standing timber upon two tracts of swamp land, and the sellers believing that they were selling the very timber and upon the same lands that the buyers thought they were buying, while in fact the one was selling and the other buying the standing timber upon a tract of swamp land that did not belong to the sellers, but to another, the Richmond Cedar Works. In such a case the minds of the sellers and buyers have never met, and the authorities agree that this is a sufficient ground upon which a court of equity should rescind or reform the contract, i. e., upon the ground of mutual mistake.

In the case of *Lumber Co.* v. *Wilson*, 51 W. Va., 30, 41 S. E. 137, the facts were quite similar to the facts in this case; and there, as here, the lower court, considering that the party from whom the information which misled to a mutual mistake on the part of both buyer and seller was not the agent of the seller, dismissed the bill asking a rescission of the contract; but on appeal that ruling was reversed, the opinion of the court saying: "From this statement of facts it is manifest that the court erred in dismissing the plaintiff's bill and refusing it any relief. If

it be conceded that Meek did not act as the agent of Wilson in the sale of the land, the case still falls within the well-settled principle that where, by reason of a mutual mistake as to a matter of fact, the vendee failed to get by his deed substantially what he contracted for, he is entitled to a rescission of the contract, although the contract was executed. Where in an agreement the mutual mistake is made by both parties in a matter which is the cause or subject of the contract—that is, in the substance of the thing contracted for—no fraud being imputable to either party, such mistake is good ground in equity for rescinding the agreement, even after it has been fully executed."

In the case just cited the opinion quotes from the case of *Glassell* v. *Thomas,* 3 Leigh 113, in which the seller and buyer each relied upon the same surveyor to point out the land, and in each instance the surveyor pointed out the wrong land, and this court held that the contract should be rescinded; that the purchaser could not be compelled to take the land which the seller actually owned in lieu of that conveyed, because it was not the land actually contracted for.

What constitutes a mutual mistake for which a court of equity will rescind a contract is shown in Kerr on Fraud and Mistake, p. 416, *et seq.,* and notes, where it is said: "The mistake may be common to both parties to a transaction, and may consist either in the expression of their agreement, or in some matter inducing or influencing the agreement, or in some matter to which the agreement is to be applied. Nothing is more clear in equity than the doctrine that a contract founded in mutual mistake of the facts constituting the very basis or essence of it will avoid it."

Among the cases there cited is *Frick* v. *Fulton,* 3 Gratt. 184, where a conveyance of land was set aside upon the ground that there was a mutual mistake as to the interest of the vendor in the land sold. See also *Chamberlaine* v.

*Marsh's Admr.,* 6 Munf. 283, and notes to Kerr on F. & M., p. 416, where, citing a number of authorities, it is said: "Where the mistake is of so fundamental a character the minds of the parties have never, in fact, met, or where an unconscionable advantage has been gained by mere mistake or misapprehension, and there has been no gross negligence in falling into error, relief may be granted."

As to the legal definition of "mistake," see Vol. 5 Words and Phrases, 4540; 27 Cyc., p. 807 and notes.

In *Calverney* v. *Williams,* 1 Vesey 210, the opinion by Lord Chancellor Thurlow says: "No doubt, if one party thought he had bought *bona fide,* and the other party thought he had not sold, that is ground to set aside a contract, that neither party may be damaged; as it is impossible to say, one shall be forced to give that price for a part only which he intended to give for the whole, or that the other shall be obliged to sell the whole for what he intended to be the price of part only."

"An error of fact takes place, either when some fact which really exists is unknown, *or some fact is supposed to exist which* really does not exist." *Mowatt* v. *Wright,* 1 Wend. 360, 19 Am. Dec., 508; 1 Story's Eq. Jur., sec. 140, *et seq.; Hooks* v. *Fitzgerald,* 68 Ill. 325, 68 N. E. 430; *Irvin* v. *Wilson,* 45 Ohio St. 426, 15 N. E. 209.

In the last cited case, which is directly in point here, the purchaser of the land was referred to one Pugh for information as to the land, and when he went to Pugh the latter made certain statements as to the land, all of which he believed to be true, but as a matter of fact he was speaking of land entirely different from that which was the subject of the contract, i. e., Pugh was mistaken as to the identity of the land. The lower court, as in this case, denied relief to the purchaser of the land, but on appeal that judgment was reversed, the opinion of the Supreme Court of Ohio saying: "We are unable to per-

ceive upon what principle of justice the plaintiff should be denied the relief he asks. The information upon which he acted had not been obtained in a casual meeting with Mr. Pugh. The defendant, by his agent, having suggested that Pugh was acquainted with the land, and taken the plaintiff to inquire of him about it, is estopped from saying that Pugh was a stranger and he had no right to rely on what he said. Moreover, the error did not occur from any bad faith in Pugh, but from a mistake that may happen to the most careful of men. As the mistake arose from an innocent error in all the parties, natural justice forbids that the loss of one arising out of it should be the gain of another." In that case many authorities are cited and reviewed.

In the case here the decree appealed from must be reversed, and the cause remanded to the Court of Law and Chancery of Norfolk city, with directions to rescind the contract complained of by appellants, and to enter such further orders and decrees as may be necessary or proper to the end that the parties to said contract may be placed *in statu quo.*

*Reversed.*