## THE NICARAO.

(District Court, E. D. Louisiana. July 21, 1926.)

Nos. 17381, 17474.

**1. Salvage ⊜⟞38.**

Two tugs and pump boat, of aggregate value of $255,000, *held* entitled to award of $12,000, one-fourth to be paid members of crew for salvage of steamship, salved value of which was $237,700, with loss by listing and beaching of $7,300.

**2. Salvage ⊜⟞38.**

Captain and chief engineer of tug, who were not prompt in reporting for duty at time tugs were used for salvage, *held* entitled to only 50 per cent. of their proportionate share of salvage.

**3. Salvage ⊜⟞49.**

Court, in awarding salvage, has duty to safeguard marine property from spurious claims, as well as to recognize meritorious ones.

**4. Salvage ⊜⟞38.**

Person supplying barge for use of diver in checking leak in steamship and acting as helper *held* entitled to $750 as share of salvage of ship, salved value of which was $237,700, with loss by listing and beaching at $7,300.

**5. Salvage ⊜⟞38.**

Helper to diver in repairing leak to ship *held* entitled to salvage award of $150 as share of salvage of ship, salved value of which was $237,700, with loss by listing and beaching $7,300.

**6. Salvage ⊜⟞38.**

Divers repairing leak in sinking ship, salved value of which was $237,700, with loss by listing and beaching of $7,300, *held* entitled to award of $4,000 and $3,000, respectively.

In Admiralty. Libels by Charles W. Bostrom and others against the Honduranian steamship Nicarao, wherein W. G. Coyle & Co. filed an intervening libel. Decree in accordance with opinion.

J. D. & M. A. Grace, of New Orleans, La., for libelant.

Terriberry, Rice & Young, of New Orleans, La., for respondent.

Lemle, Moreno & Lemle, of New Orleans, La., for interveners.

BURNS, District Judge. Libelants pray for a salvage award for service rendered the Nicarao, a Honduranian steamship of 1,445 tons, being 235 feet long, 34 feet broad, and 20 feet deep, the stipulated sound value of which is $245,000, the damage by sinking and beaching is $7,300, and the salved value is $237,700. The facts are as follows:

The Nicarao had been put off the Jahncke dry dock on the east bank side of the Mississippi river at New Orleans at about 5 o'clock p. m. on October 17, 1923, having no steam up and no crew, except the fourth engineer, a boatswain, and possibly one or two others of the crew. At about 8:30 p. m., this engineer asked the dock master to come out and give a hand, as the ship was sinking. Jahncke's night superintendent and some machinists went aboard and concluded that the main circulator discharge, the outside opening of which was 7 inches, tapering to about 6 inches, was open. The vessel had already begun to list.

Being unable to stop or check the leak, a telephone call was sent, at about 9:50 p. m., to W. G. Coyle & Co., owners and operators of towboats, for a boat to pump ship with. This company makes a special business of keeping steam up on their tugs at night for just such emergencies. Their tug Sipsey was sent, and arrived alongside the Nicarao at 10:15 p. m. She put a steam syphon into the ship; but, whether because of the height of the lift, or because of defects in the syphon, or both, she was unable to perform any pumping service, so that, at 10:25 p. m., another telephone call was sent to the Coyle Company, and the tug Adler was sent, this being a large, powerful tug, equipped with fire-fighting apparatus and wrecking gear. She arrived alongside the ship at 11 o'clock or a little later. The ship was then badly listed, say to 35 degrees, lying along the outside of the dry dock, stem upstream, so that the tugs were both on her port side. The Adler was not able to use her syphon, either because of defects, leaks, or the high lift necessary.

The ship was rapidly filling through the 7-inch opening, and was now in a perilous condition. Her draft was 14 feet at the stern. There remained but about 4 feet of her port side deck line above the water, so that in some 15 or 20 minutes her hatch combings would be awash and instantly overturn, and then sink her in some 50 feet of water. Realizing this, the tugs stood from under the port side and went about to starboard, pushed her out from the dock, and towed her across the river in 15 minutes to the nearest possible place for beaching, below the United States immigration wharf, where she was run head-on aground in about 6 feet of water at her forward end. The tugs then pushed her stern over toward shore, nearly alongside of and at an angle of about 45 degrees to the west bank. Because of the shelving bottom, there was some thirty feet of water under her stern and increasingly deep water just beyond, toward

the middle of the river. The tugs stood by, holding her up in place. Later the tugs Boswell, Samson, Gypsum Prince, A. L. Bisso, Independent, and Cadmus came up and pushed against her starboard side, to help hold the ship aground and prevent her sliding off into deep water. The syphons of the tugs were then worked, but the ship was gradually listing to port. At about 3 o'clock a. m., October 18th, the W. G. Coyle Company's pump boat No. 16 came on duty, being towed there for the purpose. She was put on the port side and set pumping.

At the time of her arrival ashore on the west bank, libelants Charles W. Bostrom, De Witt E. Saucer, Lawrence W. Lawson, and Clyde H. Young, Jr., being ashore and seeing the ship's predicament, called to it for a heaving line, to be followed by a mooring hawser, so that they might make it fast to the shore and thus hold the ship. This was done. They fastened the line passed to them tó an old wreck ashore, whereafter Bostrom went to a telephone and called up a marine diver, named Fritz John, who came between 3 and 4 o'clock a. m. He then returned home for his diving suit, and returned to the ship for duty at about 6 a. m. Bostrom being the owner of a flat boat that such divers might use, John took Lawson as a helper, and with a skiff went to Bostrom's barge, and then proceeded to the ship. As they neared it, Jahncke's tug Tiger gave them a line and brought them to the port side of the ship.

Meanwhile the dock company's man had telephoned for another diver, who arrived on the tug Cadmus at about 6 o'clock a. m. Bostrom acted as his helper or tender. They tried unsuccessfully to fit a wooden plug into the open discharge hole. The captain of the Cadmus then passed them a bag of oakum, which was finally placed in the hole successfully. Thereafter, by 8 p. m., the ship was successfully pumped and righted, except for a list of about 12 degrees. She was then towed over the river and docked. The Sipsey had left at about 12:30 p. m., and the Adler stayed with the ship, together with the other tugs. During these operations the employees of Jahncke's dry dock were actively engaged in helping generally.

The conflicting testimony usual in salvage cases as to the value of the service rendered, and to the respective shares due the contending salvors, is presented. Unquestionably the ship was in imminent danger of total loss. Her salved value, as stated, was $237,700; her loss by listing and beaching was only $7,300.

Without further detailing of the services by the tugs Sipsey and Adler, together with their pump boat No. 16, and considering that the tugs were at some risk under the circumstances attendant upon their service; that the Sipsey was worth some $70,000, the Adler $100,000, and the pump boat No. 16 $8,500; that they responded promptly, because they were kept ready, with steam up, at some expense, for just such service by the owner—I am of the opinion that the salvage was of a high order, and not compensable on a mere towage basis, and the award should be commensurate therewith.

[1, 2] However, the fact cannot be overlooked that what the Nicarao needed originally from them was efficient pumping service, and this they were both unable to furnish. The evidence shows that the pumping equipment was not of the type and power required for the efficient salving of sinking ships, and, whatever the type and power, it was not in such condition and repair as prudent management and forethought might dictate, so that an award of $12,000 will be allowed W. G. Coyle & Co., Incorporated, on their intervening libel, as owner of the two tugs and pump boat, in the proportion of $6,000 for the service of the Adler, $5,000 for the Sipsey, and $1,000 for the pump boat No. 16, one-fourth of which is to be paid members of the crews of each boat actually on duty during the service, in proportion to their respective wages, provided that the shares of Capts. Watler and Rihner, and Chief Engineer Lawrence, who were not prompt in reporting for duty, be each cut 50 per cent. The total amount of this deduction is to be distributed equally, as an extra portion, for specially meritorious service, to Richard Burris, William Henley, and George Hudson. The first, in addition to running the Sipsey's engine, got up steam and operated the pump boat in the absence of its engineer. He also assumed the risk of making fast a line on the sinking ship. Henley and Hudson assumed the risk of making fast lines from the tugs to the ship while she was in a precarious position at the dry dock.

[3-5] Upon the whole case I am not much impressed with the value of the services rendered by Charles W. Bostrom, and his co-libelants, Young, Lawson, and Saucer. Salvage awards are primarily predicated upon a broad public policy, looking to the encouragement óf bona fide rescue by volunteer persons and vessels and other marine agencies in cases of marine disaster and distress, whereby life and property may be saved. In the making of awards, a great responsi-

bility is imposed upon courts of admiralty. It is as much their duty to safeguard marine property from spurious claims as it is to recognize meritorious ones.

In the encouragement of bona fide salvage, due regard must be paid to the necessity for discouraging certain species of beach combing. The evidence satisfies me that libelant Bostrom's services were of value to the extent that he did proffer the use of his small barge for the convenience of the divers. The matter of calling for and fastening a line ashore, regardless of its necessity or desirability, coupled with the subsequent behavior of Bostrom, who testifies that he called up all his friends, whether necessary or not, who might have a chance to share the prospective reward, savors too much of bad faith.

An examination of the record, and particularly the photographs showing the position of the ship and the lead of the line ashore, passed off her port bow, satisfies me that the line was tied to the first hitching post offered by chance. For all practical purposes this line might have been left coiled on deck. However, Bostrum did supply the barge, for the use of which he is entitled to be paid. He also acted as helper for the diver, and is entitled to something for the damage sustained by the barge. This, however, in the absence of a survey, and in the light of the evidence, is difficult of determination. An award will be made in his favor to cover damage to the barge in the sum of $300, for the use of the barge $200, and for his personal service, including his help to the diver, $250, or a total of $750. Libelant Lawrence W. Lawson, who acted as helper to the diver, will be awarded $150, and Clyde H. Young and De Witt E. Saucer $100 each. [6] The divers Fritz John and August C. Reiffel stand upon a different footing. They responded to the call of distress and proceeded without contract to exert their skill and assume the risk peculiar to their calling. Yet the response to the call was somewhat tardy on the part of Fritz John, who lost some three hours of valuable time, by which the ship was jeopardized and put to needless hazard. Knowing that he would be useless, except in a diving suit, he left this equipment home when he first came to the distressed ship, so that it was necessary for him to return for it before he could function. On the other hand, Reiffel responded ready for duty aboard the tug Cadmus within a reasonable time after the telephone call for his service. Reiffel was killed in a later marine accident, and therefore did not

testify. His claim did not abate, however, and was duly proven. His rights survive in his widow and minor children. Under all of the circumstances, an award of $3,000 will be made to Fritz John, and of $4,000 to the succession of August C. Reiffel, or his legal heirs or other duly qualified legal representative.

A decree may be drawn accordingly; claimant to pay all costs.