# Staunton

SEABOARD ICE COMPANY, INCORPORATED V. WILLIE N. LEE.

September 6, 1957.

Record No. 4670.

Present, All the Justices.

The opinion states the case.

*E. L. Ryan, Jr. (White, Ryan & Reynolds,* on brief), for the appellant.

*James N. Garrett (Allen J. Gordon,* on brief), for the appellee.

SPRATLEY, J., delivered the opinion of the court.

■ This proceeding, in equity, was instituted in the Circuit Court of Norfolk County, by Seaboard Ice Company, Incorporated, against Willie N. Lee, praying the court to require Lee to specifically perform a contract in writing releasing and discharging the complainant from all claims and causes of action arising out of injuries sustained by Lee as a result of an accident on November 10, 1955, and that Lee be enjoined from the further prosecution of an action instituted by him in the Circuit Court of the City of Portsmouth against the complainant for damages for personal injuries incurred in said accident.

Lee filed an answer alleging that he had never accepted the consideration offered him for the release; that it was not intended to cover any personal injuries sustained by him; that at the time of its execution, both parties mistakenly believed that such injuries were not caused by the accident in question; and that it would be unconscionable for a court of equity to enforce the supposed release for nominal compensation for severe personal injuries suffered, its execution being based upon a mutual mistake of the facts.

The evidence was heard *ore tenus* by the trial court, and at its conclusion, the court entered a decree holding that the facts disclosed the release was executed through mutual mistake. Both specific performance thereof and the injunction requested were denied, and we granted this appeal.

The controlling issue before us is whether or not the trial court erred in holding that the release was executed through mutual mistake. It is not alleged or sought to be proved that Lee was misled by fraud or duress into making the contract.

The judgment of the trial court is presumptively correct, and will not be set aside unless it appears from the evidence that it is plainly wrong or without evidence to support it. Code of Virginia, 1950, § 8-491.

The facts are not in substantial conflict. Such conflicts as exist

were resolved by the trial court in favor of Lee. The evidence and all reasonable inferences therefrom must, therefore, be viewed by us in the light most favorable to Lee. *Word* v. *Childs*, 182 Va. 394, 397, 29 S. E. 2d 227; *Taylor* v. *Taylor*, 182 Va. 602, 29 S. E. 2d 833; *Collins* v. *Collins*, 183 Va. 408, 412, 32 S. E. 2d 657.

Willie N. Lee, 43 years of age, is a tank wagon salesman, employed by the Tidewater Fuel Company, Inc. He drove a tank wagon, a motor truck owned by his employer, in the delivery of oil. On November 10, 1955, the truck operated by him was involved in a collision with a truck owned by Seaboard Ice Company, Inc., hereinafter referred to as Seaboard. The next day Lee consulted Dr. B. L. Hargrove, a general practitioner, regarding his physical condition. He said Dr. Hargrove treated him for bursitis, giving him an injection in his veins. This treatment was repeated fifteen or twenty times between November 10th and December 30th, 1955. About the middle of December, Lee received a letter from M. T. Bohannon, attorney at law, representing the Phoenix Indemnity Company, insurance carrier for Seaboard, enclosing a release form tendering $6.00 in payment of the medical services of Dr. Hargrove for two visits. Replying by telephone, Lee said:

"I called Mr. Bohannon after I got this release for $6.00 and I told him that I couldn't sign the release for the $6.00. He asked me how much would I sign for and I told him that the truck had been out of operation and I had not been working and that I had been out for a couple of days and my doctor's bill was $6.00 for examination. I told him to wait just a moment and I'd see if I couldn't arrive at some figure. I figure about 10 or 12 dollars a day for my salary, plus commission, and I gave him a round figure of $100.00 which would not compensate me for all, but I just gave him a round figure.

"Q. What did you tell him that included?

"A. I told him that included for the doctors examination and the time the truck was out of operation.

"Q. You made that clear to him on the phone?

"A. Yes, sir, I did.

"Q. Was any other part of that discussed for any personal injury settlement?

"A. No, sir.

"Q. Did you think you had any personal injury at that time from the accident?

"A. No, sir, I didn't."

Shortly thereafter, Lee received a release form tendering $100.00. He signed it in the place prepared for the signature of a witness, and returned it. A second form was then sent to Lee, which he signed and returned. Subsequently, a check for $100.00 was sent to him, which he has never cashed. The signed release, undated, reads as follows:

"I, W. N. Lee hereby acknowledge payment to me in hand this day by Seaboard Ice Company, Incorporated, of the sum of One Hundred and No/100 ——————— Dollars ($100.00) and in consideration of the said payment I do hereby release and forever discharge the said Seaboard Ice Company, Incorporated, from all my claims and causes of action I now have and hereafter may have on account of, or in any way growing out of, injuries known and unknown, resulting or to result from the accident that occurred on or about the 10th day of November, 1955.

"I understand and agree that the said payment is the sole consideration for this release and is in full settlement of all my claims and causes of action, and there are no agreements or promises not expressed herein.

"Witness my hand and seal this ————————— day of December, 1955, at Norfolk, Virginia.

W. N. Lee    (Seal)."

Lee related in detail his visits to the several doctors, hereinafter named, their treatment of him, and his physical condition in the meantime. He has not been able to return to work because of his injuries, and says that his medical and hospital expenses have amounted to a large sum. He admits that he is able to read and write, that he read the release, and signed it because, "I had talked to Mr. Bohannon on the phone and when the release come, I signed it thinking it was the same compensation I talked to him on the phone about."

On both direct and cross-examination, in answer to the inquiry as to what the $100.00 represented, he said: "I told Mr. Bohannon I wanted $6.00 for the doctors bill, the examination, and $94.00 was for the time that the truck was out of operation to compensate me for commissions and salary." His truck was "laid up" for nine days, and he estimated his commission to be around $10.00 or $12.00 a day. He positively declared that at no time did he consider the $100.00 covered anything except the doctor's bill for $6.00 and $94.00 for time lost from work.

Dr. B. L. Hargrove, a general practitioner, testified that he treated Lee on the day after the accident. Lee told him he "had hit his shoulder and had jerked his neck when the accident had happened." Lee had, before the accident, been treated by Dr. Hargrove for bursitis, which the doctor thought had cleared up. Upon examination, however, on November 11th, the doctor said he "assumed" that there was "a reactivation and contusion of the bursa there, plus a whiplash injury which happens in a lot of accidents." He told Lee that he thought his bursitis "was acting up," and treated him for that illness. He did not recommend that Lee have X-rays made. He next saw Lee on December 20th, and he thought he mentioned that if there was no improvement with the medication given, that an X-ray should be made to see if there was any fracture of the bones; but decided to wait to see whether there was any improvement or not. On December 24th, on account of the pain of which Lee complained, he gave him an injection of codeine and continued such treatment every other day until December 30th.

Asked if he thought during his treatment that Lee had any serious nerve injury, Dr. Hargrove said: "No, sir. It wasn't discovered until later upon examination by Drs. Kirk, McFadden and others. That's right." He also said that he talked to Bohannon on December 6th and that he did not then know the seriousness of Lee's injury. Because of Lee's failure to improve, he sent him to Dr. A. A. Kirk, an orthopedic surgeon on December 30th.

Dr. Kirk, after obtaining a history of Lee's injury and condition from Dr. Hargrove and Lee, continued to treat the latter for bursitis. Subsequent examination disclosed that he had other injuries and a definite weakness of his left upper extremity which led to atrophy of the left arm. X-rays of Lee's neck did not show evidence of a fracture or dislocation; but, nevertheless, Lee was sent to a hospital and put in what was called "cervical traction; that is pulling from the neck so as to stretch the neck muscles and neck joints." He remained in the hospital from January 5th to January 10th, 1956. Dr. Kirk thought that the injury from which Lee was suffering was due to the accident. He said Lee's arm began to shrink, and after talking to Dr. J. T. McFadden, a specialist in neuro-surgery, the conclusion was reached that he had an injury of the nerves that supplied the arm. At the time of the trial of the case, Lee was receiving physiotherapy and muscle stimulation at the hospital three

times a week, a treatment which it was thought necessary to be continued for probably six months.

Dr. McFadden, called to testify on behalf of Seaboard, said that he first examined Lee on January 17, 1956, when he obtained from him a history of the accident on November 10, 1955, and a statement of his symptoms since then. He was told that Lee had been treated with traction and a collar. Asked about a report he made on March 23, 1956, he replied as follows:

"I think I can do better by summarizing. I saw this man on January 17th with the symptoms I described, and at that time we weren't sure what was wrong with him.

"We weren't sure there had been any definite organic damage to the man. When I saw him in March, it was quite obvious there had been damage; time for a month's atrophy to appear.

"The motor component of the nerve supplies the muscle, and when something happens to destroy it or partially destroy it, it results in the disuse of the muscle it supplies, and it naturally results in atrophy of the muscle group.

"This is not an uncommon type of injury. The man received a blow to his shoulder and apparently it pulled down and stretched the nerves.

"We can't tell you whether it tore the nerve roots out of the spinal cord or whether it just stretched the nerves, resulting in enough damage to kill the nerve root at the point of stretching.

"If that is what happened, it is possible for regeneration of the nerve to take place at that point which is generally slow as Dr. Kirk told you.

"If the nerve roots were torn out of the spinal cord, the injury would be permanent. The fact the man has progressive atrophy up to a point, and has been improving, is suggestive that it will show considerable improvement in time.

"I have not seen the man since March. I saw him only once when the nature of his injury was obvious. I don't know how much he has improved. At that time, the patient himself felt there was progressive slow improvement."

Asked if it took some time for the type of injury involved to show up in the form of atrophy, Dr. McFadden replied:

"We missed it cold. The first time we examined him, we missed it. It wasn't obvious. When he took his shirt off, it was perfectly

plain, as plain as could be seen, all the way across the court room."

John T. Nix, President of Tidewater Fuel Company, Inc., corroborated much of the pertinent portions of Lee's recital of his negotiations with Bohannon. He said that neither he nor Lee, prior to the signing of the release, thought that Lee was suffering from any injury received in the accident, and that after the examination of Lee, Bohannon expressed surprise that Lee was seriously injured. He also said that he did not advise Lee to sign the release, and that he had advanced, as of May, 1956, more than $1700.00 to Lee, because of illness and incapacity to work.

M. T. Bohannon said Seaboard reported the accident to him on the day of the occurrence; that he obtained a report from the driver of the Seaboard truck, but did not discuss the matter with Lee; that several days thereafter John T. Nix, President of Tidewater Fuel Company, Inc., called him and demanded payment for the damage to the truck of his company; that he told Nix to obtain estimates of the damage and forward them; and that nothing was said as to any personal injuries suffered by Lee.

On December 6th, Nix wrote Bohannon saying:

"Enclosed bills represent to the best of our knowledge, the total cost sustained by our truck in the collision with the truck owned by the Seaboard Ice Company, your client. I would suggest that you call Dr. B. L. Hargrove, 58½ Afton Square, regarding injuries received by our driver, Mr. W. N. Lee."

On December 14th, Bohannon wrote Nix as follows:

"In the claim you and Mr. Lee have against the Seaboard Ice Company, I stated yesterday that I thought the best way to handle this matter without any delay or expense to either party would be to make payment on the basis of the financial loss presented to me. The repair bills, including the two new tires were $451.72. Dr. Hargrove stated that Lee paid him $6.00. If you and Lee will sign the enclosed release for these amounts and return them to me, I will send you a check by return mail."

Bohannon said upon receiving Lee's telephone message that he was unwilling to sign the release for $6.00, the amount of Dr. Hargrove's bill, he asked Lee to name the amount he desired, and Lee replied: "Pay me $100.00 and I will settle it." There was no discussion of any payment for personal injuries; but Lee did mention loss of time from work, and the possibility of having some X-ray pictures made. A release in the sum of $100.00 was sent to Lee. He signed it in the

space intended for the signature of a witness, and returned it to Bohannon. Bohannon thereupon prepared a new form, sent it to Lee, Lee signed it properly, and on December 28, 1955, a check for $100.00 was sent to Lee.

In early January, 1956, Nix advised Bohannon by telephone that Lee had been to see Dr. Kirk regarding his continued disability. Later Lee sent Bohannon a report of the examination made of him by Dr. McFadden, and the latter's bill for $25.00.

On January 19th, Bohannon wrote Lee as follows:

"I received in the mail copy of the report of examination of you by Dr. McFadden, together with his bill of $25.00. This case was settled the latter part of December, and we can give no consideration of this report or any payment of the bill which was not authorized by us. The bill was enclosed, and I am sending a copy of this letter to Dr. McFadden as he can not look to us for payment."

In reply to the question whether the $6.00 "was simply to pay Dr. Hargrove for two examinations" of Lee, Bohannon replied: "No, up to that time I told Mr. Nix that I would be willing to make a settlement based on the expenses of the settlement of both parties, based on their expenses." When asked if "Expenses meant out of their pocket money? Is that correct?" he answered, "That's right." He agreed that all he was doing was to reimburse Lee for the examinations and loss of wages, and that he had no idea at the time the release was signed Lee had the shoulder injury, which resulted in atrophy of a nerve.

Bohannon said he closed his file. On March 15th, he received a letter from Lee's attorney returning the $100.00 check, with the advice that the payment of $100.00 was not satisfactory to his client.

On March 16th, Bohannon replied to Lee's attorney and declined further negotiations, declared the case settled, and sent the $100.00 check back to Lee.

On March 23, 1956, Lee brought action against Seaboard Ice Company, Inc., asking judgment for damages in the sum of $25,000.00 for personal injuries received in the automobile accident in question. Thereafter, on May 14th, this proceeding was instituted.

It was not contended in the lower court or before us that Seaboard would have an adequate remedy at law in the tort action which Lee had instituted against it by relying upon the provisions of the release.

It is well settled that a court of equity will, under proper circumstances, require the specific performance of a release as it will of any

other valid contract. 11 Am. Jur., Compromise and Settlement, § 35, page 283; 81 C. J. S., Specific Performance, § 88, page 604.

It is equally well settled that equity will not enforce specifically an agreement entered into under misapprehension or mistake of fact. 17 M. J., Specific Performance, § 36, page 57; 81 C. J. S., Specific Performance, § 42, page 518 and § 88, page 605; 49 Am. Jur., Specific Performance, § 54, page 69; 76 C. J. S., Release, § 25, pages 645 *et seq.*; 45 Am. Jur., Release, § 20, page 685; *Atlantic Greyhound Lines, Inc., etc.* v. *Metz,* 70 F. 2d 166.

See also 15 C. J. S., Compromise and Settlement, § 36 b, page 757; 11 Am. Jur., Compromise and Settlement, § 32, page 279; and 4 M. J., Compromise and Settlement, § 11, page 21.

It is difficult to formulate fixed rules relating to the avoidance of a release of a claim for personal injuries on the ground of mistake. There are so many factors to be considered that general rules are likely to be inaccurate or misleading. Each case must be determined under the particular circumstances attending the formulation and execution of the contract. Annotation 48 A. L. R., pages 1462 *et seq.*

While no case presenting facts precisely like those here has been decided in Virginia, the general principles involved seem to be fairly established here and in other jurisdictions. Specific execution of a contract in equity is a matter, not of absolute or arbitrary right, but is addressed to the reasonable and sound discretion of the court. *Grizzle & Wife* v. *Sutherland,* 88 Va. 584, 588, 14 S. E. 332; *Briggs* v. *Watkins,* 112 Va. 14, 70 S. E. 551; *Va. Iron, etc., Co.* v. *Graham,* 124 Va. 692, 98 S. E. 659; *Millman* v. *Swan,* 141 Va. 312, 318, 127 S. E. 166; *Walker* v. *Henderson,* 151 Va. 913, 927, 145 S. E. 311; *First National Bank* v. *Roanoke Oil Co.,* 169 Va. 99, 116, 192 S. E. 764; *Griscom* v. *Childress,* 183 Va. 42, 47, 31 S. E. 2d 309; *Christianson* v. *Brosius,* 184 Va. 958, 963, 37 S. E. 2d 50; *Clay* v. *Landreth,* 187 Va. 169, 177, 45 S. E. 2d 875.

See also *Atlantic Greyhound Lines, Inc., etc.* v. *Metz, supra; Robert Hind, Limited, et al.* v. *Silva,* 75 F. 2d 74; *Southwest Pump & Machinery Co., et al.* v. *Jones,* 87 F. 2d 879.

Stated in general terms, equity will not enforce specific performance of a contract unless it be equitable, and free from fraud, misrepresentation, or mistake. The burden is on the assailant of the contract to establish the vice he relies on by clear, cogent and convincing evidence.

*Briggs* v. *Watkins, supra,* involved a mistake in the quantity of land agreed to be sold and purchased, a factual situation somewhat similar to that here. There we approved this statement in *Lumber Co.* v. *Wilson,* 51 W. Va. 30, 41 S. E. 137:

" 'Where in an agreement the mutual mistake is made by both parties in a matter which is the cause or subject of the contract— that is, in the substance of the thing contracted for—no fraud being imputable to either party, such mistake is good ground in equity for rescinding the agreement, even after it has been fully executed.' "

We then said:

"What constitutes a mutual mistake for which a court of equity will rescind a contract is shown in Kerr on Fraud and Mistake, p. 416, *et seq.,* and notes, where it is said: 'The mistake may be common to both parties to a transaction, and may consist either in the expression of their agreement, or in some matter inducing or influencing the agreement, or in some matter to which the agreement is to be applied. Nothing is more clear in equity than the doctrine that a contract founded in mutual mistake of the facts constituting the very basis or essence of it will avoid it.' " (112 Va. page 25)

■ It is undisputed that Lee was wholly ignorant of the true nature and extent of his disability, immediate and future, as well as the cause thereof. The doctors who attended him, and Bohannon, the representative of the insurance carrier, each admitted that they did not know Lee's real condition until disclosed by later medical examinations. Dr. McFadden frankly stated that during the earlier examinations of Lee, "We missed it cold." He explained that it took some time for the type of injury involved "to show up in the form of atrophy" to the muscles. Bohannon, who did not attempt to take an unfair advantage of Lee, could not have thought that there was any severe personal injury to the latter, when he agreed to compensation in the amount of $6.00 for two visits to a physician, and $94.00 for the loss of wages. He looked upon the payment of $100.00 as a reimbursement of "out of pocket expenses," that is, a settlement "on the basis of the financial loss presented" to him, in accordance with his letter of December 14th to Nix.

The above facts were material as they clearly affected the extent and character of Lee's injuries, and correspondingly the amount of damage suffered by him, as well as the coverage included in the release. While not ordinarily in itself sufficient basis for the cancella-

tion of the contract, inadequacy is a proper element to be considered along with the other circumstances.

The material facts clearly and conclusively show that the minds of the parties did not meet upon the understanding that the consideration mentioned in the release was intended to be in full settlement of the releasee's liability.

The facts in this case distinguish it from those in *C. & O. Railway Co.* v. *Chaffin*, 184 F. 2d 948, upon which Seaboard relies. In that case the injuries to Chaffin were obvious and known to everyone; he had lost his leg below the knee as a result of a train accident. The negotiations were conducted in writing, and were easily understood; and there was no mistake. Here, the evidence of mutual mistake is clear, cogent and convincing.

The trial judge had the opportunity of seeing, hearing and observing the witnesses testify, and there is ample evidence to sustain his finding. The decree of the trial court is affirmed.

*Affirmed.*