# Richmond.

## W. R. WALKER v. W. C. HENDERSON.

October 30, 1928.

Holt, J., having taken his seat on the Supreme Court of Appeals
did not sit in this case.

916

*Statement of the case.*

W. C. Henderson filed his bill in July, 1926, against W. R. Walker, praying for the specific performance of a contract, by which it was alleged W. R. Walker had agreed on June 10, 1926, to sell and convey to the plaintiff a certain tract of land constituting a farm, containing sixty-five acres, more or less, in Campbell county. The bill contained a general description of the land, and alleged that a written memorandum of the agreement had been made and signed by Walker, as follows:

"Received of Walter C. Henderson, $5.00, part payment on farm at Holt Crossing, which I am to take sixteen and one-half shares of Barksdale-Foster Hardware stock valued at $103.00 per share.

"5–10–1926.                    W. R. Walker."

It was alleged that the complainant had tendered payment by offering to deliver the stock, but the defendant refused to accept the stock and make conveyance of the property. It was further alleged that the plaintiff had filed a notice of *lis pendens*, which was admitted to record on the 26th day of June, 1926, and, therefore, a deed executed by defendant conveying the property in question to W. C. Walker, defendant's

brother, on June 29, 1926, and admitted to record on that day, was void as against plaintiff's claim.

To this bill the defendant filed the following answer:

"That it is untrue, as stated in the bill, that he entered into a contract on the 10th of June, 1926, or at any other time, to convey the complainant the tract of land as set out in complainant's bill; that at the time mentioned in the bill of your respondent selling the said property to complainant your respondent was then heavily in debt, and he had then agreed to sell all of his property to his brother, W. C. Walker, to enable him, respondent, to pay off his indebtedness; the equity that respondent had in the property mentioned in the bill was sold to his brother at that time, but the deed had not been actually executed, but was later on executed and his brother took over said property subject to the deed of trust that was then on the property, which deed of trust is still on the property the complainant complains to have entered into contract with respondent for the purchase.

"And this respondent further says that the paper signed by him set out in bill was gotten by a false statement of complainant to the respondent as to the value of the stock in the bill in that the complainant stated that he had paid forty-five hundred dollars for seventy-five shares of stock in getting C. C. Scott to quit bidding as he, the complainant, had lost three thousand dollars on the stock, when, in fact, the complainant had purchased the stock for twenty-five hundred dollars and Scott was not gotten to quit bidding on the stock. The complainant claimed that the stock was worth $103.00 per share when, in fact, it had been purchased by the complainant for $33.33⅓ per share a short time before and that was the market value of the stock at the time of the statement made by said complainant.

"And this respondent says he was sick with splitting headache at the time the complainant called at his house and he told complainant that he could not take the matter in as he was sick; and the respondent is advised that the paper claimed to have been signed by him is not a valid contract for the sale of the land. And this respondent says that he did not know what the complainant had paid for said stock, nor did he know its value at the time said complainant called at his house and claims to have gotten the contract, and when he learned of the value of the stock and the statements of the complainant to be untrue he refused to take said stock and made deed to said W. C. Walker as he had agreed before the complainant ever had said anything about the trade. This respondent denies each and every allegation in said bill.

"And now, having fully answered the complainant's bill, this respondent prays to be hence dismissed with his reasonable costs by him in this behalf expended."

Depositions were taken upon the issues raised by the pleadings, and in May, 1927, the circuit court entered its final decree, granting specific performance to the plaintiff. This decree recites:

"On consideration whereof, and it appearing to the court from the evidence that the complainant and the defendant entered into a written contract on the 10th day of June, 1926, whereby the said defendant agreed to sell and the complainant agreed to buy a certain tract or parcel of land in Seneca magisterial district, Campbell county, Virginia, more particularly described as follows:

"A tract of land containing sixty-five acres, more or less, being all of the land now owned by the said defendant from a tract of land conveyed to him from Nannie W. Suddith and others by deed dated March

26, 1918, and recorded in the clerk's office of Campbell county, Virginia, in Deed Book III, page 560, and further described in the complainant's bill;

"That the said complainant has complied with the terms of the contract; that the receipt described in the proceedings is a sufficient memorandum in writing to validate the contract between the parties for the sale and purchase of the land described herein and in the bill; that the *lis pendens* was duly filed according to the statute, and that the deed from the defendant to W. C. Walker, being subsequent to the filing of the said *lis pendens* was void as to the property herein mentioned, already contracted to be sold by the defendant to the complainant; and that the complainant is entitled to specific performance of the contract as set up in the bill; that the deed of trust from said defendant to secure the payment of $500.00 as set forth in the bill has been paid and released."

This final decree contains also the following clause:

"Upon the motion of W. C. Walker to file his petition making himself a party to this cause, which petition is offered and dated by the court today, the court being of the opinion that he is not a necessary or proper party, said motion is overruled."

*A. S. Hester*, for the appellants.

*David S. Blankinship*, for the appellee.

CRUMP, P., after making the foregoing statement, delivered the following opinion of the court:

In the petition for appeal the appellant, defendant in the trial court, complains that the court erred:

In holding that the complainant and defendant had entered into a valid and binding contract for the sale of the land, and that the receipt was a sufficient memorandum in writing of the contract;

In holding that the complainant was entitled to

specific performance of the contract claimed by W. C. Henderson, upon all the evidence and facts in the case;

In holding that the *lis pendens* was duly filed as required by statute and had the fact of invalidating the subsequent deed to W. C. Walker, and, therefore, the defendant could not avail himself of that deed as a defense;

In holding that W. C. Walker could not file his petition and become a party defendant in the cause.

The plaintiff in his testimony stated that he and the defendant had been trying to get together on a sale of the farm for a year or more; that he, the plaintiff, had been trying to buy it, and the defendant was trying to sell it, but they could not get together on the price; that one day in the spring of 1926 (June 10th), they together, on their way to Lynchburg, passed this farm, and Walker approached him again on the subject, saying: "Let me sell you this farm," and he told Walker he would buy it, if he would make the price right. After detailing circumstances connected with the pending sale occurring on that day, from which it appears he offered fifteen shares, and Walker said he would take eighteen shares of the Barksdale-Foster Company's stock, the plaintiff states that while at Walker's store that night "I told him that I had decided I would split the difference with him and trade. We talked it over, and he told me he would let me know the next morning, and I told him if he wanted to trade to say so then, that in the morning I might not be in the notion, and he said 'I am going to trade with you.' So I gave him $5.00 to close the deal and took a receipt for it." The plaintiff further testified as to the valuation he put upon the stock:

"Q. What was the valuation per share for this stock?

"A. I told Mr. Walker it was $103.00, but it was worth more than that. It was worth $103.75.

"Q. Do you mean it was $103.75 per share?

"A. Yes.

"Q. How did you place the value on this stock?

"A. I asked Mr. Barksdale and Mr. Canada and they gave me the value on it.

"Q. So, then, your information was at the time this contract was made that this stock was carried on the books of the Barksdale-Foster Hardware Company, at $103.00 per share?

"A. Yes."

The defendant Walker testified that on the way back from Lynchburg they talked about the exchange and he told Henderson that if he would give him eighteen shares of the stock, he would talk with him about it and see what he could do; that Henderson said he would give him fifteen shares of his stock; that they discussed the matter on the way back home from Lynchburg, but he did not recall all that was said. He further testified with reference to the signing of the receipt and the value of the stock:

"A. I had a slight headache that evening, along about 7:30, and retired, somewhere along about 8:00 o'clock, or maybe 8:30, and between 9:00 and 10:00 o'clock Mr. Henderson came over to my house and said he came to tell me about the car being over at town, and broached the subject of trading the Barksdale-Foster Hardware stock. I told him I was feeling bad, and went back to my room and laid down on the bed. I asked him if he would come in. He came in, and asked me if I wanted him to go to the drugstore for something for me, but I told him no, I would get over it presently, I reckoned. He staid awhile, and insisted on trading the stock for some land. I told him I

didn't want to trade then, I wanted to investigate, and see what the stock was worth. He says: 'When I trade, I trade. Can't you take my word for it,' and I told him no, I wanted to see Mr. Webb and Mr. Barksdale. I told him that I was involved, and that I might have to borrow more money, that I was negotiating then for some. He told me that I could borrow more money on the stock than I could on the land, and I went to Mr. Henderson the next morning and offered him his $5.00 back, and told him I didn't want the stock, that I was not in a position to trade, but he said he wouldn't give me back the money, and would hold me to the trade.

"Q. What representation, if any, did he make as to the value of stock?

"A. He said it was worth $103.00 book value. I asked him what the cash value was, and he said $100.00.

"Q. Did you ask him what he paid for it?

"A. I said to him: 'You didn't pay but $4,500.00 for the seventy-five shares.' He says: 'No, but I got it cheap because I asked Mr. Scott to stop bidding, that I would sell it back to him cheaper than he could buy it at the auction.' That is what I said to him, and he didn't tell me that he paid the $4,500.00 for it, but he said he asked Mr. Scott not to bid against him, as he had lost money, so much money in the hardware company."

On cross-examination Walker stated, in answer to a question whether Henderson had misrepresented the stock to him:

"A. I said to him: 'You didn't pay but $4,500.00 for the seventy-five shares, did you?' And he said: 'No; but I asked Scott to stop bidding, that I would sell it back to him cheaper than he could buy it at auction.'

"Q. He didn't tell you that he paid $4,500.00 for it, did he?

"A. No, sir.

"Q. He told me that the book stock was marked on the books of the Barksdale-Foster Hardware Company at $103.00, didn't he?

"A. No, sir.

*    *    *    *    *    *    *    *

"Q. In your testimony you state that Mr. Henderson told you the cash value of the stock was $100.00. Are you positive in that statement?

"A. I asked him what the stock was really worth, and he said it was really worth $100.00, but the book value was $103.00.

"Q. Did he tell you in what way he estimated the stock to be worth $100.00?

"A. He told me he could sell the stock for $100.00 per share, by taking a man's note for it.

"Q. So that is the reason you thought he said it was worth $100.00 per share, is it?

"A. He said it was worth $100.00.

"Q. Did you not know that you could go to the Barksdale-Foster Hardware Company, and find out at what price the stock was carried on the books?

"A. I told Mr. Henderson to wait, that I wanted to see Mr. Barksdale."

The first question for consideration by the court is whether the written receipt signed by Walker is, under the circumstances of this case, a sufficient memorandum under the statute of frauds to enable the plaintiff to maintain his suit. The parties both lived at Brookneal, a small town in Campbell county, at the time of the transactions in question, Henderson being "in the filling station business, and grocery store business, at Brookneal," and Walker having for some time past conducted a general store at the same place. The

objection to the memorandum urged in this court, and, no doubt, before the trial court, when the case was submitted, is that the description of the tract of land is insufficient. Does "farm at Holt Crossing" so definitely evince in writing the intention of the parties regarding the subject matter of the contract as to authorize proof by extraneous evidence of its more exact location and description? The paper writing is dated, but has no caption showing where it was executed, nor does it state in what county the farm is to be found. Whether such extraneous evidence should have been rejected does not arise on this record. Such questions have been before the Virginia Court of Appeals quite frequently, and the court has, in recent years, adopted very liberal views in that respect: See *Midkiff* v. *Glass*, 139 Va. 218, 123 S. E. 329; *Matthews* v. *LaPrade*, 130 Va. 408, 107 S. E. 795; *Ford* v. *Street*, 129 Va. 437, 106 S. E. 379; *Harper* v. *Wallerstein*, 122 Va. 274, 94 S. E. 781, L. R. A. 1918C, 517; *Asberry* v. *Mitchell*, 121 Va. 276, 93 S. E. 638, L. R. A. 1918A 785.

However, the undisputed testimony on both sides, in the record before the court, does not leave the subject of lack of description open to question, and, in fact, no direct issue on that point appears in the pleadings. In the recent case of *Matthews* v. *Codd*, 150 Va. 166, 142 S. E. 383, Judge West, speaking for the court, says:

"Defendants contend that they should not be made to specifically perform their contract of purchase, for the reason that the description of the property as set forth therein is too vague and indefinite.

"The answer is that if the description of the land in the contract is too indefinite, that defect has been cured by the defendants failing to object to the suf-

ficiency of the contract and submitting the case to the
lower court upon an agreed statement of facts in which
the land is accurately and sufficiently identified. *Eaves*
v. *Vial*, 98 Va. 134, 34 S. E. 978; *May* v. *Sloan*, 101
U. S. 231, 25 L. Ed. 797; 2 Reid on Statute of Frauds,
sections 516, 521; *Miller* v. *Harper*, 63 Mo. App. 293."

In *Eaves* v. *Vial*, referred to by the court, it was
held that when the bill contains a general allegation
that the agreement was made, then the statute of
frauds need not be specifically pleaded in defense, un-
less the existence of the agreement sued on is admitted
by the answer. The answer here denies generally that
the defendant entered into the contract set out in the
bill, though it admits that the defendant signed the
memorandum. The real defense set up by the answer
is that the contract was made under such circumstances
as to deny the right of the plaintiff to call for its specific
performance. This was manifestly the theory upon
which both sides conducted the case in preparing it
for presentation to the trial court. Nowhere in the
testimony is any uncertainty suggested as to the
identity of the farm which was the subject of the con-
tract, nor as to the correctness of the description of it
in the bill, upon which the plaintiff relied. The plain-
tiff testified that he had a contract with Walker with
reference to an exchange of the shares of stock for the
farm, and he identified the receipt filed with the bill as
a memorandum of the agreement. No specific ob-
jection was made to any evidence offered by the plain-
tiff on the ground that it added terms to the memoran-
dum, which should have been, but were not, in writing.
The record shows the following question to the plain-
tiff, and the objection thereto:

"Q. Please explain the circumstances that lead up
to the making of this contract?

"This question and answer thereto is objected to by counsel for the defendant, because such contract is required to be in writing, and the contract is the best evidence, and the explanation or anything that took place before the entering of it is not evidence in this case."

This broad objection was not insisted upon, and each of the parties gave a narrative of the circumstances surrounding them and leading up to the contract of sale. The parties and witnesses refer to the tract of land as "this land," or "this farm," evidently upon the assumption that there was no dispute as to the identity of the property. In his testimony the defendant speaks of talking with Henderson about "the land mentioned in this proceeding," and of selling "the land with the deed of trust on it," and of a doubt he had whether he could sell "this land," that while he had a headache he was aware of the deal he was making with Henderson; he mentions a lien of $500.00 on "this particular land." The deed to W. C. Walker is filed, containing a description of the land contended by the defendant to be same land sold to Henderson. The pleadings and the evidence imply a concession that the land claimed by the plaintiff was the actual and identical subject matter of the negotiations and contract of or exchange between the parties.

In *Eaves* v. *Vial, supra,* the court says:

"The answer of the appellant denied the agreement set up in the bill, but she made no objection to the oral testimony offered by the appellee to prove it when the witnesses were examined, nor was any exception afterwards taken to their depositions, nor objection made to that evidence in any way, but both parties seem to have proceeded with the case upon the assumption that parol evidence was admissible to prove or disprove the agreement, and the decree of the court shows.

that the case was submitted for decision upon the pleadings, exhibits, and the testimony of the witnesses on either side, and the court based its decree upon the ground that the claim of the plaintiff, as set out in the bill, had been established by the evidence."

The court held that the case should be heard and determined upon the same evidence upon which it was heard and determined in the trial court. So, in the case at bar, the court correctly held upon the pleadings and evidence on which the case was submitted that the making of the contract had been established, and that the receipt was a sufficient memorandum in writing. Upon the case as submitted the learned trial judge could reach no other conclusion.

The minds of the parties were evidently riveted upon proving and meeting the defense that the court should not, in the exercise of its judicial discretion, grant specific performance under the circumstances of the case, and the bulk of the testimony was in relation to that question. We turn now to that feature of the case.

No principle of equity jurisprudence is more universally recognized than that embodied in the rule of the equity forum, that the specific performance of a contract is not a matter of absolute right, but rests in a sound judicial discretion. The contract, to be specifically enforced, must be equitable and free from fraud, misrepresentation or mistake, or other inequitable feature. The judicial discretion of the chancellor is not arbitrary, but judicial. A court of equity does not decree specific performance when it would be inequitable to do so. These general principles are recognized in the recent case of *Millman* v. *Swan*, 141 Va. 312, 127 S. E. 166. They constitute an application of the familiar maxim that he who asks equity must do equity,

and he who comes into equity must come with clean hands. Analysis and discussion of these features of relief by specific performance will be found in 5 Pomeroy on Equity Jurisp., section 2184 and following sections; Pomeroy on Specific Performance (3rd ed.), sections 175, 183, 185, and 188.

There is much testimony in the record to the effect that the defendant was in financial difficulties and was in the month of May, under the advice of counsel, dealing with his creditors for a composition of his indebtedness, the creditors being represented by a Credit Bureau in Lynchburg, and that on May 29th a settlement at fifty per cent of his debts was agreed upon, and he or his friends were engaged in an effort to realize the necessary amount from his property, which was finally done prior to June 10th, by his brother, W. C. Walker, raising the money on his own note, endorsed by a friend, C. C. Scott, upon an understanding that W. R. Walker should convey to the brother all his property, subject to any liens upon it, the liens to be discharged by the brother. The deed conveying the property, including the farm in question, was accordingly executed on June 29th, and is the deed referred to in the bill and answer. At the time of the negotiations and the agreement between the parties there was a deed of trust for $500.00 and two or three judgment liens resting on the farm in dispute and Walker would not have been able to have paid them; but they were discharged, before suit brought, out of the funds in the hands of W. C. Walker. All of these details were not known to Mr. Henderson. However, he knew on June 10th that Mr. Walker was insolvent, and that his creditors were pushing him; that he was negotiating a settlement with his creditors, and there was in Lynchburg some talk of an assignment and of the right of

Walker to dispose of the farm. It is shown that Walker in making the arrangement to pay fifty cents on the dollar told the representative of the creditors that he would have to borrow the money by conveying all his property as collateral, and unless this was done he would have to go into bankruptcy. It was evidently this situation that caused a doubt to arise in the minds of the parties as to the right of Walker to dispose of any of his property. Certainly, it should have occurred to any intending purchaser that what was essential for Walker and his creditors was cash or its readily convertable equivalent. The sale or exchange was hastily closed upon the insistence of Henderson. The value of the stock, and its availability as a basis for raising money must have been and was a material subject considered by the parties. It is quite manifest that Walker received the impression from all the information given by Henderson that the stock was worth $100.00 per share, and that he could borrow as much or more money on the stock than he could on the land. The evidence shows that $7,500.00 of the stock of the Barksdale-Foster Hardware Company, which was a concern doing business in Brookneal, had been bought by Henderson in March, 1926, at a judicial public sale for $2,500.00. He stated that he had procured the seventy-five shares at that price, because he had asked Mr. C. C. Scott not to bid on it. Mr. Scott, when put on the stand, testified:

"A. I will tell you exactly the whole situation. At that particular time, I had talked with Mr. Barksdale— had gone down and looked over the situation with the president and manager of the Barksdale-Foster Hardware Company. I got him to let me see the books and so on, and I thought if I could get hold of a controlling interest in the stock—$7,500.00 worth of stock I be-

lieve it was—that I might be able to work it out. In the meantime, I didn't think anybody was bidding on the stock after it passed $1,800.00 or something like that, except Mr. Henderson and myself. Mr. Henderson came to me and asked me not to bid on it, or something to that effect. I don't remember exactly the words, but the old gentleman—that is Mrs. Henderson's father—came to me and told me to bid on it, that he wanted it to bring all it would, so I run the stock up to $2,400.00, or $2,500.00—somewhere around there—I don't remember the exact dot, and then I stopped, but. as far as anybody having any effect on me, I had gone as far as I would have gone anyway. I thought I was getting on dangerous ground after it got up that high. Nobody run it after it passed $1,-800.00 or $1,900.00, except Mr. Henderson and myself."

He further says, when asked as to the value of sixteen and one-half shares of the stock on June 10th, 1926: "Well, a man having just that much stock in there, I don't think it would be worth anything to him." It is fairly clear from all the evidence that the sixteen and one-half shares of stock were unmarketable, and nonbankable as collateral, although the secretary of the corporation testified that it was carried on the books at $103.00 a share, based upon the difference between the liabilities and the value they placed upon the stock of goods and assets of the corporation. He further stated no dividends had been declared in 1925 or 1926, and he did not know as to prior years, as he had been with the company only two years. Walker, as a resident of Brookneal, must have had general knowledge of the business of the Barksdale-Foster Company, but is is not shown that he had any acquaintance with their condition or earnings.

The inference from the testimony is that Walker was a small dealer, and not a man of much business wisdom. The contract in the instant case is, in effect, a contract of exchange of personal property for real estate. The real estate was worth "about $1,500.00, maybe $1,600.00," is the only evidence in the record. Both parties speak of the transaction as a *trade*. Upon any reasonable valuation placed upon the respective properties, it was certainly not a fair trade. The evidence may not show actual fraud on the part of Mr. Henderson. He was acting in his own interest. Inequality and inequitable advantage may result in a refusal of the remedy of specific performance. Failure to communicate facts material under the circumstances, or conduct leading to misapprehension, may influence a court to refuse specific performance. The contract must be fair, equal and just in its terms and consequence. 5 Pomeroy on Equity Jurisprudence, sections 2206, 2207. Representatives as to value of stock should be carefully weighed. 23 Corpus Juris, note 70, page 200.

Furthermore, the requirement of mutuality of remedy in cases of this character is presented here in rather a peculiar manner. The settled rule is that where the defendant has signed the writing and the plaintiff has not, the institution of the suit is the equivalent of plaintiff's signature and binds him, the remedy being thus made mutual. The remedy of specific performance, however, when the transfer of personal proper is sought, is rarely allowed by the equity court. The transaction was practically an exchange of properties. However desirable the stock might have appeared to Walker, he was practically without independent remedy on his own initiative against Henderson.

The learned trial court was doubtless correct in its refusal to entertain the petition of W. C. Walker to be made a party, this petition being offered after all evidence had been considered and the case submitted to the court for the purpose of passing upon the rights of the plaintiff and defendant, the only two parties to the record. No move was made by either of the parties to make W. C. Walker a party. The trial court, at the instance of the plaintiff and defendant, having settled the case between them, the appellant here cannot complain of the failure of the court to allow another person, on that person's petition only, to be made a party to proceedings, which were being finally disposed of at the time the petition was presented. W. C. Walker was unquestionably a proper party to the bill, and no doubt the court would have directed that he be made a party to and be required to answer the bill if the plaintiff had filed an amendment to his bill, or if such a suggestion had been made by the defendant by demurrer or otherwise within reasonable time after filing of the answer. When a *vendee* assigns his contract, and right to a conveyance, to a third party, it is not necessary nor usual to bring such third party into a *suit by the vendor;* when the vendor has made conveyance of the legal title, then the party holding the legal title should be made party to a bill filed by the vendee. 1 Barton's Chancery Practice (3rd ed.), pages 120, 121; Pomeroy on Specific Performance (3rd ed.), sections 487, 493. Neither appellant nor appellee is here complaining of any ruling of the trial court to make W. C. Walker a party upon a motion or request made by either of them at any time. No such question is therefore before the appellate court. W. C. Walker is not a party to the

case, and cannot be heard in this court. It follows that he is not bound by the final decree in the case.

■ ■ Ordinarily the specific performance of a contract for the sale of real estate is a matter of course, whenever the required equitable conditions are fulfilled. That is, the contract must be certain, unambiguous, mutual, and upon a valuable consideration; it must be perfectly fair in all its parts; free from any misrepresentation or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain; and its performance not oppressive upon the defendant, nor productive of unfair results towards third persons. Pomeroy on Specific Performance, section 38. Otherwise the party complaining is left to his proceeding for damages.

■ Our opinion is that upon the facts in this case, the court of equity cannot do exact justice, and in the exercise of a sound discretion should decline relief by the exercise of its power of ordering specific performance, and should relegate the plaintiff to his claim for damages for breach of the contract, as an adequate remedy. The final decree should, therefore, be reversed and a decree entered dismissing the bill. It will be accordingly so ordered.

*Decree reversed.*