# Richard C. Firebaugh and Eugene D. Lunsford

## v.

# Edwin Murray Hanback, Trustee and John C. Richards, Trustee, Trustees for Ye Old Hunters Club

Record No. 930713

April 15, 1994

Present: Carrico, C.J., Compton, Whiting, Lacy, Hassell and Keenan, JJ., and Poff, Senior Justice

*Katherine Carruth Link (Frank L. Summers, Jr.; Nelson, McPherson, Summers & Santos,* on brief), for appellants.
*Benham M. Black (Black, Noland & Read,* on brief), for appellees.

SENIOR JUSTICE POFF delivered the opinion of the Court.

We awarded this appeal to consider whether two real estate agents who had entered into a contract to purchase real estate owned by their principal were entitled to specific performance of that contract. We will uphold the chancellor's judgment denying the prayer of the purchasers' bill of complaint.

The chancellor based his decision on a finding that the agents breached the fiduciary duty they owed to their principal. We will summarize the evidence underlying that finding as it was adduced in hearings conducted by a commissioner in chancery.

Eugene D. Lunsford, a licensed real estate agent associated with Real Estate III, solicited a listing agreement for his firm from Edwin Murray Hanback and John C. Richards, Trustees for Ye Old Hunters Club (the club). In its original form dated April 2, 1990, the agreement listed for sale "126.669 acres located on the East side of Route 600 South of Deerfield". Lunsford mailed a copy of that form to Quinlan H. Hancock, one of the five members of the club. In a letter to Lunsford, Hancock returned what he identified as a "modified listing agreement which is necessary under the circumstances." The description of the property was modified by a handwritten note to read "126.669 acres plus or minus", and the date of the document was changed to May 15, 1990.

The evidence showed that, following an appraisal performed on site by Richard C. Firebaugh, the club had acquired the property in 1973. The deed, which reserved life estates to the grantors and the survivor, described the property as "120.80 acres, more or less, this being a sale in gross and not by the acre, and being . . . a tract formerly containing 193.80 acres, more or less". Lunsford had obtained the information required to draft the listing agreement by examining that deed and the county tax records. Those records showed that the club had paid all annual assessments against property identified as containing 126.669 acres.

In September 1990, Lunsford enclosed in a letter to Hancock a written offer to purchase signed by Raymond R. Wittekind and Margaret B. Wittekind. As drafted the offer identified the property as "126 acres more or less" but provided:

> Seller to provide purchaser at closing with boundary survey not more than 10 years old. If not available Purchaser and Seller to equally share the cost of a new survey. Deviations in acreage in excess of 10 acres shall increase the purchase price by $500 per acre for overage and decrease the price by $500 per acre for underage.

In a letter to Lunsford dated September 11, 1990, Hancock returned the document, executed as a contract by Hanback and Richards, but in a modified form. The language concerning a survey and its effect upon the purchase price was stricken and the deletions were initialed by the trustees of the club. In his letter, Hancock stated that he could "only represent that the acreage is the same as when we acquired it" and that the "executed contract" was "for the sale of the . . . farm in an 'as is' condition." Hancock explained at the hearing that "what I mean by that [language] is just exactly what was there" and that he had "communicated" that meaning to Lunsford "[m]any, many times."

The Wittekinds signed a counter offer at a higher price, and Lunsford submitted it to the club. Hancock testified that this offer "was rejected by the members because it had a provision that deviation in acreage from 126 acres of five acres or more . . . shall result in a price adjustment". Further, he stated that he "again, explained to Mr. Lunsford . . . the fact that we were selling the farm as such, without regard to acreage".

In a telephone conversation conducted with Hancock in November 1990, Lunsford relayed a third offer at a still higher price submitted by the Wittekinds. As appears from the exhibit introduced at the hearing, the document contained similar language concerning a survey and acreage deviation price changes as that included in the two prior Wittekind offers, and the club rejected that offer as well.

Lunsford testified that the cause of the failure to obtain a final contract with the Wittekinds was "not being able to get a release signed on [the life estate]" and that Hancock had "said he and the Hunt Club would pay half of [the cost of a survey]." Asked if he had discussed such a solution with Lunsford, Hancock replied, "Absolutely not."

In December 1990, Lunsford referred to trustees of the club an offer made by a third party. That offer described the property as "126

acres, Map # 40-46" and contained no language concerning a survey or acreage deviation. The club rejected that offer but only because it contained a provision for deferred payment of a portion of the purchase price.

The listing agreement the club executed in May 1990 with Real Estate III expired on December 31, 1990. Lunsford prepared an extension agreement dated January 1, 1991. His description of the property failed to include the words "plus or minus" which Hancock had added to the original draft of the listing agreement. Lunsford acknowledged at the hearing that he had signed the names of the trustees of the club to the extension agreement without their permission.

Lunsford left Real Estate III and joined Richard C. Firebaugh in the firm of Dick Firebaugh Real Estate, Inc. Lunsford explained to Firebaugh the reasons he had been unsuccessful in his attempts to negotiate a sale of the club's farm. At Lunsford's invitation, the club executed a listing agreement with his new firm. After taking a view of the farm, Firebaugh and Lunsford became interested in acquiring the property themselves.

Lunsford testified that he and Firebaugh "discussed the writing of the contract" and that "he told me what to put on the contract." Lunsford's wife filled in the blank spaces on the printed form as he instructed. Lunsford testified that "Mr. Firebaugh looked at it, was not happy with it, changed some of the things on it" and that "[w]e redid it at least once, maybe twice."

As submitted to the club, the contract, dated April 20, 1991, defined the term "real property" as "the land, and all improvements thereon . . . described as . . . 126 acres, more or less". The contract further provided that the "[p]roperty is being purchased in 'as is' condition unless otherwise noted", fixed the purchase price at $110,000, and waived the broker's commission.

The trustees executed the contract in that form. Hancock testified that his understanding was that the club was selling "exactly what we got from [the prior owners], regardless of what it was", and that he assumed that the closing attorney would insert a provision in the deed identifying the transaction as a sale in gross.

Lunsford and Firebaugh construed the language of the contract differently. Lunsford testified that "had we been buying the property by the gross, I would have put [it] in [the contract]". Reaffirming his earlier testimony, Hancock said that he intended the "as is" language to address the acreage as well as the condition of the premises and that the subject of the sale was to be "something close to the acreage that's in the contract." Hancock added that the purchasers' interpretation of

the language of the contract was not communicated to the trustees of the club before they signed the document.

After the trustees signed, the purchasers employed Robert E. Funk to conduct a survey. Funk reported that his preliminary calculations showed that the farm contained only 89.5 acres, and the purchasers did not close the sale on the date scheduled. The purchasers' attorney advised the club by letter that there was a "deficiency in acreage of 36.5 acres" and that Firebaugh and Lunsford were prepared to close at a later date at an "abated purchase price of $90,967.80".

The club refused a tender of a cashier's check for that amount, and the purchasers filed a bill of complaint asking the court to "order the Defendants specifically to perform the contract and . . . order an abatement in the purchase price of $19,032.20". In responsive pleadings seeking, inter alia, rescission of the contract, the trustees of the club alleged that Firebaugh and Lunsford had breached a duty as their agents "to advise [them] that they . . . considered the offer to be a sale by the acre rather than in gross."

A commissioner in chancery conducted a hearing on the questions framed by the parties and issued his report. The commissioner found that the contract contemplated a sale by the acre; that the acreage deficiency was approximately 30%; that the purchasers were entitled to specific performance with an abatement in the purchase price; that a survey should be completed in order to determine the amount of the abatement; and that neither party is liable to the other for costs.

The trustees of the club filed several exceptions to the commissioner's report. In a letter opinion, the chancellor ruled:

> The exceptions . . . are sustained to the extent that they object to the ruling that the plaintiffs performed all fiduciary duties owed to the defendants. Having breached their duties, the plaintiffs are not entitled to specific performance of the contract. Having breached the contract, they are not now entitled to enforce it according to the original terms and conditions.

In a final decree entered February 22, 1993, the chancellor reaffirmed those rulings and assessed "[a]ll court costs" against the purchasers. The purchasers assigned error, the trustees assigned cross-error, and we granted this appeal.

We have consistently applied the following standard of appellate review:

[T]he report of a commissioner in chancery should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence. This rule . . . is not applicable to pure conclusions of law contained in the report. On appeal, a decree which approves a commissioner's report will be affirmed unless plainly wrong, but where the chancellor has disapproved the commissioner's findings, this Court must review the evidence and ascertain whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court.

*Hill v. Hill,* 227 Va. 569, 576-77, 318 S.E.2d 292, 296-97 (1984) (citations omitted); *accord Jarvis v. Tonkin,* 238 Va. 115, 121-22, 380 S.E.2d 900, 904 (1989); *Morris v. United Virginia Bank,* 237 Va. 331, 337-38, 377 S.E.2d 611, 614 (1989); *Spence v. Griffin,* 236 Va. 21, 27-28, 372 S.E.2d 595, 598 (1988); *Seemann v. Seemann,* 233 Va. 290, 293, 355 S.E.2d 884, 886 (1987); *Sprott v. Sprott,* 233 Va. 238, 240, 355 S.E.2d 881, 882 (1987); *Wells v. Weston,* 229 Va. 72, 75, 326 S.E.2d 672, 674 (1985); *Wiltshire v. Pollard,* 220 Va. 678, 680, 261 S.E.2d 542, 543 (1980); *Martinsville Bank v. Cobler,* 215 Va. 852, 854, 213 S.E.2d 800, 802 (1975).

█ Our review of the record shows that the purchasers intended the contract they drafted and revised to be a contract of sale by the acre rather than a sale in gross; that the purchasers were aware that the sellers, who had repeatedly rejected other contract offers containing explicit provisions for a survey and a sale by the acre, intended to execute nothing other than a contract of sale in gross; and that the purchasers failed to advise the sellers of their interpretation of the language they had chosen until the trustees of the club had executed what they thought was a contract of sale in gross.

█ Firebaugh and Lunsford were engaged by the owners in the listing agreement as their selling agents. "An agent is a fiduciary with respect to the matters within the scope of his agency." *H-B Partnership v. Wimmer,* 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979). As a fiduciary,

a broker owes his principal the duty to use utmost fidelity to him and must disclose to him all facts within the broker's knowledge which may be material to the transaction, or which might influence the principal in deciding upon a course of action.

*Burruss v. Green Auction Co.,* 228 Va. 6, 10, 319 S.E.2d 725, 727 (1984); *accord Van Deusen v. Snead,* 247 Va. 324, 331, ___ S.E.2d ___, ___ (1994); *Va. Real Estate Comm. v. Bias,* 226 Va. 264, 269, 308 S.E.2d 123, 125-26 (1983); *Metro Realty v. Woolard,* 223 Va. 92, 98, 286 S.E.2d 197, 200 (1982); *Owen v. Shelton,* 221 Va. 1051, 1054, 277 S.E.2d 189, 191 (1981); *Duncan v. Barbour,* 188 Va. 53, 61-62, 49 S.E.2d 260, 264 (1948); *Mitchell v. Hughes,* 143 Va. 393, 403, 130 S.E. 225, 228 (1925).

■ As a general rule, it is true, as the purchasers say, that

[w]hen the seller is unable to convey the entire estate in the land that he has contracted to sell, the buyer may compel the seller to convey whatever estate he may have and the buyer will be allowed an abatement of the purchase price to compensate him for the deficiency in title.

*Hawks v. Sparks,* 204 Va. 717, 720, 133 S.E.2d 536, 539 (1963) (citations omitted).

However, we have recognized exceptions to the general rule.

■pecific performance of a contract is not a matter of right, but rests in the discretion of the trial court to be granted or refused according to established principles and the facts of each case.

*Id.* Thus, we have denied specific performance of contracts executed under a mutual mistake of fact. *Ice Co. v. Lee,* 199 Va. 243, 99 S.E.2d 721 (1957) (specific performance of settlement contract denied for mutual mistake of fact concerning terms of contract); *Millman v. Swan,* 141 Va. 312, 127 S.E.2d 166 (1925) (decree awarding real estate purchaser specific performance of contract with abatement of purchase price reversed for mutual mistake of fact concerning zoning ordinance); *Briggs v. Watkins,* 112 Va. 14, 70 S.E. 551 (1911) (contract for sale of real estate rescinded for mutual mistake of fact concerning quantity of land).

■ "[H]e who asks equity must do equity, and he who comes into equity must come with clean hands." *Walker v. Henderson,* 151 Va. 913, 927-28, 145 S.E. 311, 315 (1928) (decree awarding real estate vendee specific performance reversed). The court in *Walker* explained that "[f]ailure to communicate facts material under the circumstances, or conduct leading to misapprehension, may influence a court to refuse specific performance." *Id.* at 931, 145 S.E. at 316. Reaffirming this principle, we have recently held that a court of equity may be jus-

tified in applying the "clean hands" doctrine against a litigant who fails to communicate material facts, even when he owes no fiduciary duty to do so. *Wiglesworth v. Taylor,* 239 Va. 603, 608-09, 391 S.E.2d 299, 303 (1990).

■ As we have said, Firebaugh and Lunsford had a fiduciary relationship with the club. We are of opinion that the record fully supports the chancellor's conclusion that the purchasers breached their fiduciary duties and, applying the "clean hands" doctrine, we hold that a correct application of the law supports the chancellor's decision that the purchasers "are not entitled to specific performance of the contract . . . [or] to enforce it according to the original terms and conditions."

Finally, the purchasers contend on brief that "entry of the order for costs was an abuse of the trial court's discretion." We disagree.

■ The relevant statute, reinforcing the rule applied by this Court, provides that a court of equity has "discretion . . . over the subject of costs". Code § 14.1-177. "[I]n the exercise of this discretion the chancellor should award costs in favor of the party or parties 'substantially prevailing.' " *McLean v. Hill,* 185 Va. 346, 351, 38 S.E.2d 583, 586 (1946) (citations omitted). Indeed, we have found abuse of discretion and reversed or modified decrees that failed to award costs to the prevailing party. *See, e.g., Smith v. Woodlawn Construction Co.,* 235 Va. 424, 431, 368 S.E.2d 699, 703 (1988); *Safway Steel Scaffolds v. Coulter,* 198 Va. 469, 478-79, 94 S.E.2d 541, 548 (1956); *Morison v. Dominion Nat. Bank,* 172 Va. 293, 303, 1 S.E.2d 292, 295 (1939); *Williams v. Bond,* 120 Va. 678, 688, 91 S.E. 627, 630 (1917); *Peters v. Waverly Co.,* 113 Va. 318, 325, 74 S.E. 168, 171 (1912).

■ We have upheld the chancellor's conclusion that the club was entitled to prevail on the merits. Yet, the purchasers argue that the club should not be awarded costs because it failed to file an exception to the commissioner's recommendation that "neither party" was entitled to costs. That recommendation constituted a finding that the club, the losing party in the commissioner's report, should not be liable for costs. To require the club to file an exception to that finding would be to require it to except to a decision in its favor. We decline to do so.

Finding no reversible error in the court below, we will affirm the chancellor's decree.

*Affirmed.*