Present:  All the Justices

THOMAS SCOTT CLINE, ET AL.

v.  Record No. 060237  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        January 12, 2007
ROY C. BERG, JR.

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Thomas H. Wood, Judge

Roy C. Berg, Jr. (Berg), filed a bill of complaint against Thomas S. Cline and Teresa B. Cline (the Clines), seeking an injunction requiring the Clines to dismantle and remove a 32-foot high, 200-foot long fence constructed of utility poles and plastic wrap because it unreasonably interfered with Berg's use and enjoyment of his real property.  After hearing evidence ore tenus, the circuit court held the fence was a private nuisance and ordered the Clines to remove it.  We, however, conclude the circuit court abused its discretion in granting injunctive relief to Berg because it failed to apply the "clean hands" doctrine.  For that reason, we will reverse the circuit court's judgment.

RELEVANT FACTS

Berg and the Clines are adjacent landowners in Augusta County and previously lived next door to one another. After several disagreements between the parties, the Clines decided to move from their residence adjoining Berg.  They

built a home on a 76-acre parcel of real estate that also joins Berg's property. The Clines' new home is still in view of Berg's residence although it is situated approximately 1800 feet away on top of a hill.

Soon after moving into their new home in January 2005, the Clines discovered that Berg had constructed a tripod about 11 feet tall and equipped with motion sensors and seven flood lights. The flood lights intermittently come on when the Clines turn on certain lights in their home. A neighbor, who had been to the Clines' home on several occasions, testified that Berg's lights are obviously directed at the Clines' home and illuminate their property. The neighbor likened the lights to "someone having their high beams on their car shining them towards the house."

The Clines learned Berg had also installed surveillance cameras on his property. The cameras tracked some of the Clines' movements while on their property. When asked at trial if any of the cameras had the Clines' house in view, Berg answered, "Not really. . . . If [the cameras] track across – the camera that sits there on camera three on the tracker . . . might catch the very top of [the Clines'] roof [b]ut [t]hey are not aimed at his home or his house." The Clines' evidence, however, contradicted Berg's testimony. Because Berg's surveillance

system uses "wireless . . . cameras" that operate on an "open frequency," the Clines were able to pick up the wireless signal from Berg's cameras. When the Clines began receiving interference on their television, they unplugged the wireless transmitter they use with their television, and, in Mr. Cline's words, "low and behold there's our house on the TV."

Berg testified he installed the lights because rabid raccoons had been spotted in the neighborhood and because the Clines had allegedly harassed him. Berg also introduced testimony from a real estate appraiser who opined the Clines' fence has caused a "nine percent diminution in [the] value" of Berg's property. But, the appraiser admitted the market value of Berg's property would increase by nine percent if the Clines remove the fence.

In a letter to Berg, the Clines' attorney warned that "[t]he intensity and direction of [the] lights make them very noticeable in the Cline[s'] house and are disrupting their use and enjoyment of their home." He requested Berg to "redirect these lights so that they do not illuminate or shine in the direction of the Cline[s'] property, or just . . . leave them turned off." Berg testified that, in response to the letter, he changed the wattage of the bulbs

3

in the flood lights from 125 watts to 100 watts and "double-checked" to insure that the illuminated area is within the boundary of his property.

When Berg failed to comply with the request to redirect the lights, the Clines' attorney again wrote to Berg, informing him to

> accept this letter as notice on behalf of the Clines that they plan to build a solid fence between your property and theirs. This will be high enough to block their view of your property, and to address your stated concerns. They would prefer not to incur this expense, but your actions leave them no choice. Unfortunately, to be effective, this fence will have to be 35 feet high and over 200 feet long and will run close to your rear property line. Frankly, it will be an eyesore and probably affect not only their property value, but yours as well. However, their undisturbed use of their home and property are worth the expense and inconvenience.
>
> Plans will be to start this project in five days. If you do not want this built, simply leave the Cline family alone, and turn off your light display. If you continue with your antics, they will have no other recourse than to proceed.

A few months later, the Clines built the fence at issue. It is constructed with approximately 20 utility poles spaced 10 feet apart. A type of plastic wrap used to cover silage is attached to the poles. The fence is 32 feet high and runs approximately 200 feet along the border between the Cline property and the Berg property. The Clines initially considered building a 50-foot high, indoor

horse-riding arena but settled for the fence as a compromise to their other neighbors.  Mr. Cline testified the fence blocks the lights and other devices Berg installed to watch the Cline family and then explained why he erected the fence:

> The reason is because Mr. Berg was stalking us.
> He basically used the lights as an intimidation
> factor.  Every time me or my wife would walk out
> to let the dog out, he would sit there and play
> with the lights on and off to let us know that he
> was watching us.  If we would drive up and down
> our own driveway, he would take the lights and
> track us with it.  If my son was down in the
> field taking care of the neighbor's horses and
> coming back up, then he would be waiting with the
> lights.

When Berg filed his bill of complaint against the Clines, he circulated a letter to nine other nearby residents, seeking their support in having the Clines' fence removed.[1]  Berg stated in his letter, "I hate to burst [the Clines'] bubble but I am from the city with apartment buildings that are 20 and 30 stories high, and no view of anything but walls, and trash cans.  I will just install higher perimeter lights that will light, track, and record movement around my property."

After considering the evidence introduced by both parties, the circuit court, in a letter opinion, rejected

---

[1] Notably, none of these residents testified on Berg's behalf at the trial in this case.

Berg's explanation for installing his surveillance system. The court explained that, when "compar[ing] the testimony of Berg against the evidence introduced by the Clines . . . , it becomes apparent that Berg was not truthful with the [c]ourt." In the circuit court's view, "[t]he evidence introduced by the Clines proved beyond any question that Berg's surveillance system allowed Berg to watch on his television anything going on at the Cline residence, provided it took place in front of an open window."

Continuing, the circuit court expressed the "firm . . . opinion that Berg [was] primarily responsible for what is an intolerable situation" and stated it was "satisfied beyond question that the Clines would never have even thought about such a fence had they been left alone." Addressing the Clines' argument that the "clean hands" doctrine barred the equitable relief sought by Berg, the circuit court indicated it "could, in good conscience, dismiss the [b]ill of [c]omplaint on that doctrine." The circuit court even stated the "clean hands" doctrine would be the "[f]irst and foremost" way to rule in favor of the Clines. But, the circuit court refused to apply the doctrine because it believed the fence is "an ugly scar on a beautiful area" and should be removed. The circuit court concluded that, although the fence does provide some

6

protection to the Clines from Berg's lights and is not a "spite fence," it is nonetheless a private nuisance.[2]

For the reasons stated in its letter opinion, the circuit court entered an order directing the Clines to remove the fence from their property. The Clines appeal from that judgment.

## ANALYSIS

The dispositive issue on appeal is whether the circuit court abused its discretion in granting injunctive relief to Berg because it failed to apply the "clean hands" doctrine. With regard to that issue, the Clines argue that Berg, as the party seeking an equitable remedy, must have "clean hands" in order to prevail. Continuing, the Clines point out that the circuit court found "Berg [was] primarily responsible for what is an intolerable situation" and that it could dismiss the bill of complaint on the "clean hands" doctrine. Given these findings, the Clines contend the circuit court then abused its discretion by ignoring Berg's "unclean hands" and granting him injunctive relief.

"The doctrine of 'unclean hands' is an ancient maxim of equity courts," Richards v. Musselman, 221 Va. 181, 185,

_____

[2] The term "spite fence" is defined as "[a] fence erected solely to annoy a neighbor." Black's Law Dictionary 1437 (8th ed. 2004).

7

267 S.E.2d 164, 166 (1980), and is generally expressed in these terms:

> "Pursuant to the equitable maxim that 'He who comes into equity must come with clean hands,' . . . the complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on. Equity will not give relief to one seeking to restrain or enjoin a tortious act where he has himself been guilty of fraud, illegality, tortious conduct or the like in respect of the same matter in litigation."

Id. at n.1 (quoting W. deFuniak, Handbook of Modern Equity § 24 (2d ed. 1956)); accord Butler v. Hayes, 254 Va. 38, 43, 487 S.E.2d 229, 232 (1997) ("a litigant who seeks to invoke an equitable remedy must have clean hands"); Firebaugh v. Hanback, 247 Va. 519, 526, 443 S.E.2d 134, 138 (1994) ("[h]e who asks equity must do equity, and he who comes into equity must come with clean hands"); McNeir v. McNeir, 178 Va. 285, 290, 16 S.E.2d 632, 633 (1941) ("a plaintiff must come in with clean hands, that is, he must be free from reproach in his conduct"); Walker v. Henderson, 151 Va. 913, 927-928, 145 S.E. 311, 315 (1928) (same). Application of the doctrine turns upon the facts of each particular case and is therefore left to the sound discretion of the fact finder. Wiglesworth v. Taylor, 239 Va. 603, 608, 391 S.E.2d 299, 303 (1990).

Applying these principles, we conclude the circuit court abused its discretion by failing to apply the "clean hands" doctrine.  At the outset, we note that Berg did not assign cross-error to the circuit court's factual findings that he was the party primarily responsible for the "intolerable situation" at issue and that the Clines would never have constructed the fence if Berg had merely left them alone.  Thus, those factual findings are binding on appeal.  Chesapeake Hosp. Auth. v. Commonwealth, 262 Va. 551, 565, 554 S.E.2d 55, 62 (2001).

Berg, nevertheless, maintains the circuit court was correct in refusing to apply the "clean hands" doctrine.  Characterizing the circuit court's factual and credibility findings as "a severe ad hominem attack" upon his character and testimony, Berg argues the application of the "clean hands" doctrine in this case would create an inequitable result and violate public policy because the fence is a private nuisance.

It is true that the doctrine is not absolute and should not be applied when the result would be inequitable or violate public policy.  Richards, 221 Va. at 185, 267 S.E.2d at 167; Harrell v. Allen, 183 Va. 722, 732, 33 S.E.2d 222, 226 (1945); Waller v. Eanes, 156 Va. 389, 398, 157 S.E. 721, 725 (1931).  We do not, however, agree with

9

Berg's position that such a result would ensue in this case. Berg ignores the circuit court's finding that the Clines would never have erected the fence if he had left them alone as requested in their attorney's letter to Berg. The circuit court further opined "the fence would disappear if the surveillance equipment, including the lights, disappeared." A court of equity "will not relieve against conditions brought about by the improper conduct of the party seeking relief." Wilson v. Wall, 99 Va. 353, 356, 38 S.E. 181, 182 (1901). Irrespective whether the fence is a private nuisance, Berg was not "free from reproach in his conduct," McNeir, 178 Va. at 290, 16 S.E.2d at 633, and that conduct was "in respect of the same matter in litigation." Musselmann, 221 Va. at 185 n.1, 267 S.E.2d at 166 n.1 (citation omitted).

CONCLUSION

In light of the unchallenged factual findings regarding Berg's conduct, we conclude the circuit court abused its discretion in failing to apply the "clean hands" doctrine and deny the injunctive relief requested by Berg. We will therefore reverse the judgment of the circuit court and enter final judgment here in favor of the Clines.[3]

---

[3] In light of our decision, it is not necessary to address the Clines' remaining assignments of error.

Reversed and final judgment.